CITY AND COUNTY OF DENVER, a municipal corporation of the State of Colorado, Plaintiff-Appellant,

Colorado Association of Commerce and Industry, Plaintiff in Intervention Appellant,

and

Chemical Waste Management, Inc., a Delaware corporation; Colorado Disposal, Inc., a Colorado corporation; Waste Management, Inc., a Delaware corporation, Defendants-Appellants,

v.

Thomas EGGERT, Charles Pitts, and John Nicholl, in their official capacities as members and commissioners of the Board of County Commissioners of the County of Arapahoe; The Board of County Commissioners of the County of Arapahoe; The Metropolitan Denver Sewage Disposal District No. 1, a political subdivision of the State of Colorado; The Tri-County District Health Department, a political subdivision of the State of Colorado; The State of Colorado; The Colorado Department of Health, a department of the State of Colorado; Frank Traylor, in his official capacity as Executive Director of the Department of Health; Shell Oil Company, a Delaware corporation; Shell Chemical Company, a division of Shell Oil Company; John Doe(s), Defendants-Appellees,

and

Citizens Against Lowry Landfill and City of Aurora, Defendants and Intervention-Appellees.

No. 81SA425.

Supreme Court of Colorado, En Banc.

June 21, 1982.

Rehearings Denied July 12, 1982.

Max P. Zall, City Atty., John L. Stoffel, Jr., Robert M. Kelly, George J. Cerrone, Jr., Asst. City Attys., Denver, for the City and County of Denver.

Holland & Hart, John Fleming Kelly, Jeffrey C. Pond, and Davis, Graham & Stubbs, John M. Sayre, Gregory J. Hobbs, Jr., Denver, for Colorado Ass'n of Commerce and Industry.

Saunders, Snyder, Ross & Dickson, P. C., Eugene F. Megyesy, Jr., Martha Phillips Feiten, Denver, for Chemical Waste Management, Inc.; Colorado Disposal, Inc.; and Waste Management, Inc.

Peter L. Vana, III, Arapahoe County Atty., Littleton, and McMartin, Burke, Loser & Fitzgerald, P. C., Ronald S. Loser, Herbert C. Phillips, Englewood, for Thomas Eggert, Charles Pitts, John Nicholl and the Board of County Commissioners of the County of Arapahoe.

Inman & Flynn, P. C., John J. Flynn, Jr., Denver, for Metro Denver Sewage Disposal Dist. No. 1.

J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Janice L. Burnett, David K. Rees, Asst. Attys. Gen., Denver, for the State of Colo., Colorado Dept. of Health; and Frank Traylor, Executive Director of the Dept. of Health.

Musick & Cope, Richard M. Foster, Robert C. Kerr, Boulder, for Citizens Against Lowry Landfill.

Claybourne M. Douglas, Asst. City Atty., Aurora, for the City of Aurora.

DUBOFSKY, Justice.

The plaintiff, City and County of Denver, its contractor, Chemical Waste Management, Inc. (Chemical Waste) and Metropolitan Denver Sewage Disposal District No. 1 (Metro)[1] appeal a judgment of the Denver district court affirming the defendant Arapahoe County Commissioners' order that Denver, Chemical Waste and Metro cease and desist depositing hazardous wastes and sewage sludge at the Lowry Landfill. Denver's complaint, and responsive cross-claims and counter-claims, joined requests for declaratory and injunctive relief with a request for review of the cease and desist order under C.R.C.P. 106(a)(4). The district court heard only the C.R.C.P. 106(a)(4) claim and determined that it did not have jurisdiction to review the order, which was in the form of a resolution with "findings of fact" and a "decision," because the Commissioners were acting in their quasi-legislative capacity. In the alternative, the district court ruled that even if the Commissioners' order was quasi-judicial in nature, they did not exceed their jurisdiction, abuse their discretion or act arbitrarily or capriciously in adopting the resolution. We reverse the judgment of the district court.

We conclude that the cease and desist order issued by the Commissioners was quasi-judicial and was not preceded by adequate notice. Because the County failed to provide adequate notice, the hearing which followed the notice could not be an appropriate basis for a quasi-judicial decision. Therefore, the cease and desist order is void. However, we address concerns which will arise in a new proceeding. We remand the case to the district court with directions to dismiss all of the pending claims.

I.

In July 1964, Denver acquired from the federal government the old Lowry bombing range, 2,680 acres in Arapahoe County. That year Denver began operating a sanitary landfill on 300 acres of the Lowry land, and beginning in 1969, Metro spread domestic sewage sludge on a portion of the land. Three years after Denver began the landfill operation, the General Assembly adopted the Solid Wastes Act which required that the operator of a sanitary landfill obtain a certificate of designation from the county in which the landfill is located. Colo.Sess. Laws 1967, ch. 358, 36–23–1 at 759, now at sections 30–20–101 et seq., C.R.S.1973 (1977 Repl.Vol. 12 and 1981 Supp.).[2] Denver applied to Arapahoe County for a certificate of designation under the Solid Wastes Act, and on September 16, 1968, the County granted a certificate designating the entire tract of land deeded from the United States to Denver for a sanitary landfill operation.

Between 1968 and 1980, Denver's landfill operation accepted various types of hazardous waste in addition to non-hazardous trash and debris. The Environmental Protection Agency (EPA), which monitors hazardous waste disposal sites under the Resources Conservation and Recovery Act of 1976 (RCRA), 42 U.S.C. § 6901 et seq.

1. In its complaint, Denver named Denver Metropolitan Sewage District No. 1, Waste Management, Inc. and its subsidiaries, Chemical Waste Management, Inc. and Colorado Disposal, Inc., as defendants. The corporations, which have contracted with Denver to operate the hazardous waste disposal facility and the landfill operation at Lowry Landfill, and Metro aligned themselves for the most part with Denver, admitting the allegations of the complaint and filing cross-claims.

2. The statute was amended in 1971, Colo.Sess. Laws 1971, ch. 103, 36–23–1 at 340. The 1971 amendments automatically applied to all hold-

ers of certificates of designation issued under the 1967 statute. In addition, the Hazardous Waste Act, sections 25–15–101 et seq., C.R.S. 1973 (1981 Supp.) allowed an existing hazardous waste disposal site in active operation prior to July 1, 1981, which had obtained and possesses a certificate of designation under the Solid Wastes Act, to be operated under the Hazardous Waste Act if it met applicable federal requirements and regulations contained in the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 (RCRA), 42 U.S.C. § 6901 et seq. (Supp. IV 1980).

(Supp. IV 1980), listed the Lowry Landfill as one of the facilities known to have received hazardous waste which could result in significant environmental damage. Also concerned about hazardous waste at the Lowry Landfill, Dr. Frank Traylor, director of the Colorado Department of Health, on May 14, 1980, wrote to Denver's mayor, stating that the Health Department's investigation of the site revealed that it was not designed or constructed to receive hazardous wastes and that monitoring indicated contamination of groundwater in the alluvial aquifer.[3]

To meet the concerns of the Department of Health and the EPA, Denver contracted with a private firm, Waste Management, Inc. for its subsidiary, Colorado Disposal, Inc., to operate the sanitary landfill, and for another subsidiary, Chemical Waste, to design and construct a new hazardous waste facility, the Denver-Arapahoe Chemical Waste Facility (new facility), on sections 31 and 32 of the Lowry bombing range. The new facility, available for disposal of hazardous wastes from a five-state region, utilizes several technical processes including chemical landfill, drum burial, chemical deodorization, and solar evaporation. Waste Management invested initial capital of $5,000,000 and began construction of the new facility in June, 1980. Under the contract, Denver is to receive 12% of the gross profits of the operations, but not less than $250,000 per year.

On August 5, 1980, Chemical Waste, Colorado Disposal, and Metro applied to Arapahoe County for a transfer of Denver's 1968 certificate. The Commissioners granted a temporary certificate of designation for 120 days, pending a hearing on the transfer application.[4] However, by resolution of October 27, 1980, the Commissioners reversed themselves and determined that no transfer of the original certificate of designation was necessary and that Denver, as owner of the land, would continue to be responsible for operations at the Lowry Landfill. In the same resolution, the Commissioners directed that a public hearing be held on November 24, 1980, to "review the engineering and operating details of the Lowry Landfill...." Both the resolution and the subsequent public notice, published in several Arapahoe County newspapers, stated: "The purpose of said hearing shall be to allow information regarding the landfill operation to be made public in the interests of the health, safety and welfare of Arapahoe County citizens."

At the November 24th hearing, the County Attorney spoke first. He stated that the County was no longer considering a transfer of Denver's 1968 certificate of designation and that the hearing was for the purpose specified in the October 27th resolution. Thereafter, Denver, Colorado Disposal, Chemical Waste and Metro representatives gave brief statements. Their attorneys did not participate in the hearing. Representatives of the Tri-County Department of Health, State Department of Health, and the Colorado Geological Survey, the Colorado Attorney General, and the Mayor of Aurora also made presentations. The consensus of those who made comments was that while the contract operation represented "current state of the art technology and management practices," and constitutes "a substantial improvement of the past operation of the site," the hazardous and chemical waste facility should be moved to a more geologically suitable site in an area with fewer nearby residents. During the public comment portion of the hearing, a number of individuals spoke in opposition to the operations at Lowry Landfill. At no time during the hearing did the Commissioners announce what they intended to do with the information presented.

3. Colo.Sess.Laws 1979, ch. 270, 25–15–101 at 1072 required the Department of Health to study the disposal of hazardous wastes in Colorado.

4. The temporary certificate apparently was intended to enable Denver and Chemical Waste to take advantage of section 3005(e) of RCRA

(42 U.S.C. § 6925(e)) which allows any person who owns or operates a facility in existence on November 19, 1980, and who has applied for a federal permit, to be deemed to have been issued a permit for purposes of RCRA until the EPA administrator acts on the permit application.

On December 8, 1980, the Commissioners adopted Resolution 1140–80 listing 24 specific findings of fact which concluded that Denver "has expanded the operation of the Lowry Landfill beyond the intent and purpose contemplated by the Board of County Commissioners when they issued the [1968] Certificate of Designation." The Commissioners allowed the sanitary landfill operated by Colorado Disposal to continue, but decided that Metro's sludge placement operation was unacceptable and directed it to cease by December 31, 1982.[5] Finally, the Commissioners determined that the new hazardous waste facility posed a substantial health and safety hazard to the residents of Arapahoe County and that Denver and Chemical Waste must "cease and desist from the placement, storage, burial, or disposal of these wastes at Lowry Landfill within 10 days."

Denver filed suit against numerous named defendants in the Denver district court on December 10, 1980, seeking judicial review under C.R.C.P. 106, declaratory and injunctive relief, damages, and a stay of the cease and desist order. The court granted a stay as of the date the suit was filed. The court allowed intervention in support of Denver by the Colorado Association of Commerce and Industry (CACI), represent-

ing users of the new facility,[6] and intervention in support of the Commissioners by Citizens Against Lowry Landfill (CALL). The County counterclaimed, seeking an injunction under section 30–20–113, C.R.S. 1973 (1977 Repl.Vol. 12).[7] The district court considered only the C.R.C.P. 106 claim, and, on July 9, 1981, ruled that the Commissioners' resolution was quasi-legislative action, and therefore the court had no jurisdiction under C.R.C.P. 106(a)(4). Alternatively, the court ruled that were the resolution a quasi-judicial decision, its review of the record supported the decision because the Commissioners did not abuse their discretion or act arbitrarily or capriciously in the adoption of the resolution. The court entered final judgment under C.R.C.P. 54(b) on the C.R.C.P. 106(a)(4) claims and stayed the cease and desist order.

## II.

Judicial review under C.R.C.P. 106(a)(4) is available "where an inferior tribunal (whether court, board, commission, or officer) exercising judicial or quasi-judicial functions, has exceeded its jurisdiction or abused its discretion, and there is no plain, speedy and adequate remedy." *See Grant v. District Court*, Colo., 635 P.2d 201 (1981).

5. Metro did not file a separate brief in this court. Metro's cross-claim alleges that on June 19, 1972, the County held a hearing to determine if Metro's "sludge digestion operation" at the Lowry Landfill met the minimum standards under C.R.S.1963 36–23–10, now section 30–20–110, C.R.S.1973 (1981 Supp.). The County allowed the operations to continue, apparently without a specific ruling or certificate other than Denver's 1968 certificate of designation. At the November 24, 1980 hearing, a representative of Metro indicated that Metro transports well over 1000 tons of wet sludge a day to the landfill where it is incorporated into the soil. The product was described as a fertilizer and not a hazardous waste. The contract between Chemical Waste and Denver limits Metro to sludge disposal on sections 4 and 9 of the Lowry bombing range. The County's December 8, 1980 resolution found that "dumping of large volumes of sludge on a daily basis at the Lowry Landfill is a major source of the obnoxious odor problem."

6. The RCRA requires generators of chemical and hazardous waste to dispose of that waste only in properly approved sites. 42 U.S.C.

§§ 6901, 6922(4), (5), and (6). The defendant City of Aurora challenges CACI's standing to intervene, but Aurora did not challenge CACI's standing before the district court and therefore, we do not discuss the issue other than to note that CACI's complaint in intervention pled injury in fact on its behalf and on behalf of its members. *See Cloverleaf Kennel Club, Inc. v. Colorado Racing Commission*, Colo., 620 P.2d 1051 (1980).

7. Section 30–20–113 provides: "Any solid wastes disposal site and facility ... that is operated or maintained in a manner so as to violate any of the provisions of this part 1 [Solid Wastes Disposal Sites and Facilities] or any rule or regulation adopted pursuant thereto shall be deemed a public nuisance, and such violation may be enjoined by a district court of competent jurisdiction in an action brought by the department, the board of county commissioners of the county wherein the violation occurred...."

*Snyder v. City of Lakewood*, 189 Colo. 421, 542 P.2d 371 (1975) sets out a test for determining when an agency action is "judicial or quasi-judicial" and subject to certiorari review. Under the *Snyder* test, the action of an agency will be deemed quasi-judicial for 106(a)(4) purposes if:

(1) A state or local law requires that the body give adequate notice to the community before acting;

(2) A state or local law requires that the body conduct a public hearing pursuant to notice at which time concerned citizens must be given an opportunity to be heard and present evidence;

(3) A state or local law requires the body to make a determination by applying the facts of a specific case to certain criteria established by law.

542 P.2d at 374.

In this case, the district court, applying the *Snyder* test, ruled that Resolution 1140–80 was not a quasi-judicial action subject to judicial review under C.R.C.P. 106(a)(4) because it could find no state or local law requiring the commissioners, before they issued their order, to give adequate notice, conduct a public hearing, or apply certain criteria to specific facts. That the district court could not find a state or local law to bring the Commissioners' action within C.R. C.P. 106(a)(4) is understandable in light of the conflicting positions of the parties as to what the procedures adopted by the Commissioners were intended to accomplish. At the district court hearing, the Commissioners conceded that their resolution was not an attempt to conduct a revocation or suspension hearing under section 30–20–112 of the Solid Wastes Act.[8] They also argued that they did not have an application from Denver or Chemical Waste for a transfer of Denver's certificate[9] or an application under section 30–20–103, C.R.S.1973 (1981 Supp.) for a new certificate for Chemical Waste.[10] The Commissioners asserted that because they were not considering a new application, there was no requirement in state or local law for notice or hearing before the issuance of its cease and desist order.

Instead of submitting an application for a new certificate, Denver and Chemical Waste maintained that the new facility is covered by the existing certificate. Denver and Chemical Waste did provide information which under section 30–20–103 is required of one submitting an application for a new certificate.[11] The County referred the information submitted by Denver and Chemical Waste to the Department of Health for review and recommendation, and the reviewing agencies determined that the proposed revisions to operations of the Low-

**8.** Section 30–20–112, C.R.S.1973 (1977 Repl. Vol. 12) provides: "The board of county commissioners, after reasonable notice and public hearing, shall temporarily suspend or revoke a certificate of designation that has been granted by it for failure of a site and facility to comply with all applicable laws, resolutions, and ordinances or to comply with the provisions of this part 1 [Solid Wastes Disposal Sites and Facilities] or any rule or regulation adopted pursuant thereto."

**9.** Denver and Chemical Waste had applied to transfer Denver's certificate, but the County Attorney ruled that a transfer application was not necessary. Denver did not resist transferring its certificate to Chemical Waste, but the record does not indicate an interest on the part of either Denver or Chemical Waste in applying for a new certificate.

**10.** Section 30–20–103 provides: "Any person desiring to operate a solid wastes disposal site and facility within the unincorporated portion of any county shall make application to the

board of county commissioners of the county in which such site and facility is or is proposed to be located for a certificate of designation."

**11.** Section 30–20–103 requires that an application "set forth the location of the site and facility; the type of site and facility; the type of processing to be used, such as sanitary landfill, composting, or incineration; the hours of operation; the method of supervision; the rates to be charged, if any; and such other information as may be required by the board of county commissioners. The application shall also contain such engineering, geological, hydrological, and operational data as may be required by the department by regulation. The application shall be referred to the department for review and for recommendation as to approval or disapproval, which shall be based upon criteria established by the state board of health, the water quality control commission, and the air pollution control commission."

ry Landfill were in accordance with the minimum standards in the statutes.

Under the Solid Wastes Act, proceedings before the board of county commissioners concerning a disposal facility would normally be in the context of an application proceeding under sections 30–20–103 and 30–20–104[12] or a proceeding for suspension and revocation under section 30–20–112. In both instances the applicable statutory provision requires reasonable notice and a public hearing.[13] However, the Commissioners' characterization of its action in this case does not fall precisely into either statutory classification.

■ The Commissioners may not avoid giving Denver, Chemical Waste and Metro an effective opportunity to be heard merely by characterizing its action as not within the purview of the statutory provisions mandating procedural safeguards. We conclude that the Commissioners were limited by the Solid Wastes Act to revoking or suspending Denver's certificate or considering a new certificate for Chemical Waste, actions requiring notice, hearing, and application of facts in a particular case to certain criteria established by state law. Therefore, the only actions which the Commissioners could have taken meet the definition of quasi-judicial action under *Snyder.*

■ In addition, the action taken by the Commissioners, however characterized, was of a quasi-judicial rather than legislative nature. Quasi-legislative action is prospective in nature, is of general application, and requires the balancing of questions of judgment and discretion. *Cottrell v. City and County of Denver,* Colo., 636 P.2d 703 (1981). Quasi-judicial action decides rights and liabilities based upon past or present facts. *See Talbott Farms, Inc. v. Board of County Commissioners,* 43 Colo.App. 131, 602 P.2d 886 (1979). Legislative facts "do not usually concern the immediate parties." 2 *K. Davis, Administrative Law Treatise* § 12:3 at 413 (2d ed. 1979). Legislative facts involve empirical observations and "need not be developed through evidentiary hearings," but where adjudicative facts are involved, "the parties must be afforded a hearing to allow them an opportunity to meet and to present evidence." *Association of National Advertisers, Inc. v. Federal Trade Commission,* 627 F.2d 1151, 1162 (D.C.Cir.1979), *cert. den.* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980). Here, the Commissioners' resolution does not contain generally applicable performance standards or criteria or adequate procedural safeguards to protect future parties. The

**12.** Section 30–20–104(1), C.R.S.1973 (1977 Repl.Vol. 12) details the criteria to be considered by county commissioners in deciding whether to grant an application for a certificate: "In considering an application for a certificate of designation, the board of county commissioners shall take into account: (a) the effect that the solid wastes disposal site and facility will have on the surrounding property, taking into consideration the types of processing to be used, surrounding property uses and values, and wind and climatic conditions; (b) the convenience and accessibility of the solid wastes disposal site and facility to potential users; (c) the ability of the applicant to comply with the health standards and operating procedures provided for in this part 1 and such rules and regulations as may be prescribed by the department; (d) recommendations by local health departments."

**13.** Section 30–20–104(2) provides that approval of an application is discretionary with the commissioners "subject to judicial review by the district court of appropriate jurisdiction" and subsection (3) sets out the procedures the commissioners must follow in considering an appli-

cation: "Prior to the issuance of a certificate of designation, the board of county commissioners shall require that the report which shall be submitted by the applicant under section 30–20–103 be reviewed and a recommendation as to approval or disapproval made by the department and shall be satisfied that the proposed solid wastes disposal site and facility conforms to the comprehensive county land use plan, if any. The application, report of the department, comprehensive land use plan, and other pertinent information shall be presented to the board of county commissioners at a public hearing to be held after notice. Such notice shall contain the time and place of the hearing and shall state that the matter to be considered is the applicant's proposal for a solid wastes disposal site and facility. The notice shall be published in a newspaper having general circulation in the county in which the proposed solid wastes disposal site and facility is located at least ten but no more than thirty days prior to the date of the hearing." *See* note 8, *supra* for text of section 30–20–112.

resolution pertains only to the immediate parties claiming an interest in a certificate of designation.[14]

Nevertheless, the Commissioners argue that the resolution should be characterized as quasi-legislative because the original issuance of Denver's certificate of designation was a legislative act under the 1967 Solid Wastes Act which encompassed existing waste disposal sites without requiring notice and a hearing before the issuance of a certificate. The Commissioners then reason that because the issuance of the certificate was a legislative act, their resolution, which they characterize as construing the authority granted under the original certificate, also must be a legislative act.

What the Commissioners overlook is their determination that Denver expanded the operation of the Lowry Landfill beyond the intent and purpose contemplated by the County when the certificate of designation was issued. That determination, along with many other factual determinations in the resolution, is not a generalized conclusion of future applicability. It pertains only to the Lowry Landfill site and not to any other location or parties. Most important, the effect of the resolution is characteristic of a quasi-judicial action. In ordering the cessation of hazardous waste and sewage sludge disposal at this site, the Commissioners were adjudicating the rights and obligations only of the parties involved.

We conclude that the result of the Commissioners' resolution, although not characterized by them as adjudicating the rights of the parties involved, and not preceded by a public hearing required by either state or local law, was quasi-judicial action. Because we determine the action was quasi-ju-

dicial, we next must consider whether the notice of hearing which the Commissioners gave was sufficient.

## III.

The district court ruled in the alternative that if the Board's action was quasi-judicial, a review of the record indicated that the Board had acted properly under C.R.C.P. 106(a)(4). The court's findings did not specifically discuss the adequacy of notice. Our conclusion that the Board's action was quasi-judicial requires consideration of the notice issue, and we now determine that proper notice of the Board's contemplated action was not given the parties.

■ Under the Solid Wastes Act, quasi-judicial action by county commissioners must be preceded by reasonable notice. Sections 30–20–104(3) and –112. Proper notice of quasi-judicial agency action must reasonably describe the subject matter of the hearing, any charges to be considered, and the action contemplated. *State Civil Service Commission v. Conklin*, 138 Colo. 528, 533, 335 P.2d 537, 539–540 (1959). If the notice is ambiguous, the ambiguity should be resolved against the notice. *Holly Development, Inc. v. Board of County Commissioners*, 140 Colo. 95, 101–02, 342 P.2d 1032, 1036 (1959).

■ The notice preceding the November 24th hearing stated that the hearing's purpose was to "allow information regarding the landfill operations to be made public."[15] Counsel for Denver, Chemical Waste, and Metro did not participate in the hearing. Employees from Denver, Chemical Waste and Metro were asked by the Commissioners to make statements and respond to

---

14. Another basis for determining that the resolution is not quasi-legislative, as the district court held, is that only the State Department of Health has rule-making power under the Solid Wastes Act. The State Department of Health has the power to promulgate rules and regulations for the engineering design and operation of solid wastes disposal sites and facilities. Section 30–20–109, C.R.S.1973.

15. The notice preceding the November 24th meeting, published in several Arapahoe County

newspapers, stated: "[A] Public Hearing will be held on Monday, November 24, 1980, at 9:30 o'clock a. m., regarding the proposed operations of the Lowry Landfill ... [and] to review the engineering details regarding industrial, chemical, and or toxic waste disposal at the landfill. The purpose of said hearing shall be to allow information regarding the landfill operation to be made public in the interests of the health, safety, and welfare of Arapahoe County citizens."

questions, which they did. No witnesses were called and no cross-examination was conducted. It is clear from a review of the record of the administrative proceeding that Denver, Chemical Waste, and Metro had no idea that the result of the hearing would be a cease and desist order effective almost immediately for the chemical and hazardous waste disposal operation and effective in two years for the sludge operation.

A situation similar to the one here occurred in *Public Utilities Commission v. Colorado Motorway, Inc.*, 165 Colo. 1, 437 P.2d 44 (1968). There, the Public Utilities Commission announced a hearing "for the purpose[s] of a general investigation of sightseeing and charter service ... [and] adopting rules and regulations therefor." After the hearing, the commission issued two decisions, one changing the general rules governing all sightseeing and charter operators and the other restricting the operations of a single permit holder. We said:

> The Public Utilities Commission, in a general investigation held for the purpose of promulgating rules and regulations, cannot, regardless of the type of evidence that may be presented to it, revoke, amend or alter permits or certificates of participating parties. It must comply with the statutory procedural requirements which would legally justify the end sought to be accomplished, issue a notice, hold a hearing at which the respondent is given an opportunity to defend itself, and

finally, enter its decision in acordance with the evidence. Anything less will not satisfy the statute nor that quality of fairness required by "procedural due process."

437 P.2d at 47–48.

■ Individual license or permit decisions involving adjudicative facts are subject to basic due process guarantees. *Colorado Water Quality Control Commission v. Town of Frederick*, Colo., 641 P.2d 958 (1982). The due process clause of the Colorado Constitution, Art. II, Sec. 25, "requires at a minimum the same guarantees as those protected by the due process clause of the federal constitution under the fourteenth amendment." *Air Pollution Variance Board v. Western Alfalfa Corporation*, 191 Colo. 455, 461, 553 P.2d 811, 816 (1976). "The essence of procedural due process is fundamental fairness. This embodies adequate advance notice and an opportunity to be heard prior to state action resulting in deprivation of a significant property interest." *Mountain States Telephone and Telegraph Company v. Department of Labor and Employment*, 184 Colo. 334, 338, 520 P.2d 586, 588 (1974). *See Hide-A-Way Massage Parlor, Inc. v. Board of County Commissioners*, 198 Colo. 175, 597 P.2d 564, 566 (1979).

While all the parties disagree in their characterizations of the purpose of the proceedings which resulted in Resolution 1140–80,[16] it is clear that the cease and desist

---

**16.** The State concedes procedural irregularities and believes that Chemical Waste's hazardous waste operation is a new facility which needs a new certificate. CALL maintains that for a County to perform the function contemplated under the Solid Wastes Act, the Commissioners must have the authority to inform the operator of a waste disposal facility when he has expanded his activities beyond those authorized in the certificate. CALL argues that Denver and Chemical Waste were required to obtain a new or modified certificate of designation, and that, in fact, the Commissioners treated their submission as a request for a new or modified certificate. The City of Aurora also believes that the County treated Denver and Chemical Waste's submission as a request for a new or modified certificate. The Commissioners, maintaining that Denver did not apply for a

new certificate, and that no transfer of its certificate to Chemical Waste was required, assert that the purpose of the hearing was to determine what operations were allowed or precluded under the existing certificate of designation. The Commissioners and CALL argue that the Commissioners' resolution, including the cease and desist order, was no more than a warning to Denver that it was violating its certificate, and if the violations continue, the Commissioners would institute revocation proceedings under section 30–20–112, C.R.S.1973 (*see* note 8, *supra*) or an injunction under section 30–20–113, C.R.S.1973 (*see* note 7, *supra*). The difficulty with this argument is that the revocation hearing or injunctive proceeding could be limited to whether Denver and Chemical Waste violated the cease and desist order, without addressing the validity of the original order.

order it contains goes far beyond the result expected from a public informational hearing, which is all the notice given could be interpreted as announcing. The announcements prior to the hearing and the structure of the meeting itself do not meet the requirements of reasonable notice in sections 30–20–103 and –112, nor do they satisfy the due process requirement of fundamental fairness. Because the notice of the hearing was improper for anything other than an informational hearing, the action taken as a result of the hearing, with no further opportunity for public notice and an opportunity to be heard, is invalid. *See Holly Development, Inc. v. Board of County Commissioners, supra.*

## IV.

The State Department of Health, represented by the Attorney General, has asked us to rule, regardless of procedural irregularities, that the Denver-Arapahoe Chemical Waste Facility cannot operate legally under the existing certificate of designation, but must obtain a new certificate under the Solid Wastes Act because of the change in the entity operating the facility. This we decline to do. However, the Commissioners are not precluded from seeking to stop the hazardous waste, sludge and landfill operations through proper procedural channels.

■ The Denver-Arapahoe Chemical Waste Facility is now governed by the Hazardous Waste Act, section 25–15–101 *et seq.*, C.R.S.1973 (1981 Supp.). Section 25–15–201(3) of that act provides:

Any existing hazardous waste disposal site which has obtained and possesses a certificate of designation pursuant to part 1 of article 20 of title 30, C.R.S.1973 [Solid Wastes Disposal Sites and Facili-

ties], and which meets all applicable requirements and regulations under the federal act [RCRA] shall be deemed to have a certificate of designation issued pursuant to this part 2 and shall be fully subject to the provisions of this part 2 which apply to certificates of designation issued pursuant to this part 2.

The certificate of designation for an existing hazardous waste disposal site in this instance is the 1968 certificate of designation issued to Denver for the original Lowry sanitary landfill.

Section 25–15–206 of the Hazardous Waste Act provides:

A substantial change in ownership, design, or operation of a hazardous waste disposal site, as defined in rules and regulations of the board, shall be submitted to the board of county commissioners or the governing body of the municipality for its approval before such change shall become effective.

Prior to the Commissioners' hearing on November 24, 1980, Denver and Chemical Waste submitted plans to the County and the affected state agencies indicating substantial changes in design or operation of a hazardous waste disposal site. Under section 25–15–206, those changes cannot legally be implemented under an existing certificate of designation until approval by the Arapahoe Board of County Commissioners.[17]

■ The sewage sludge and sanitary landfill operations of Metro and Colorado Disposal do not come under the Hazardous Waste Act. Therefore, the legal question is whether Denver's contract with Colorado Disposal and its arrangement with Metro (which was not described to us) require a new certificate for change of operator under the Solid Wastes Act. Section 30–20–104(1)(c), C.R.S.1973, requires the county

Such a boot-strap argument allows Denver's certificate to be revoked or Chemical Waste's operation to be enjoined without notice or hearing of the charges which gave rise to the cease and desist order and serve as the basis of revocation or injunction.

17. Although the Hazardous Waste Act has added additional requirements for operators of

hazardous waste facilities since Denver's certificate was issued in 1968, subjecting Denver to the Hazardous Waste Act does not deprive it of property or contractual rights because its certificate is akin to a license. *Mountain Medical, Inc. v. City of Colorado Springs*, 43 Colo.App. 391, 608 P.2d 821 (1980). *See* page 226, *infra.*

commissioners to consider, in deciding whether to grant a certificate, "[t]he ability of the applicant to comply with the health standards and operating procedures" in the Act and the department's rules and regulations. This provision implies that a new certificate is required when there is a change of operator, because the Commissioners could not consider the ability of the operator to manage the site absent an application for a new certificate.

Moreover, the Solid Wastes Act is in the nature of a licensing statute which requires the operator of a waste disposal facility to obtain a certificate, and, normally, a certificate to operate a particular site and facility is personal and nontransferrable without prior approval. The Colorado Court of Appeals has described a license as having "none of the elements of a contract;" nor does it confer "an absolute right but a personal privilege to be exercised under existing restrictions and such as may thereafter be reasonably imposed." *Mountain Medical, Inc. v. City of Colorado Springs*, 43 Colo.App. 391, 393, 608 P.2d 821, 823 (1980) *quoting Rosenblatt v. California State Board of Pharmacy*, 69 Cal.App.2d 69, 158 P.2d 199 (1945).

However, section 30-20-108, C.R.S.1973 (1977 Repl.Vol. 12)[18] authorizes a governmental unit to operate a solid wastes disposal site and facility through contract with another person. From the language of the statute it appears that a governmental unit which has received a certificate of designation for an "approved solid wastes disposal site and facility," such as Denver received in 1968, may then operate that site and facility through contract under the governmental unit's certificate, as long as the site

and facility comply with the Solid Wastes Act. Therefore, we conclude that the operations of Colorado Disposal and Metro, if pursuant to contract with Denver and in compliance with the Solid Wastes Act, may be conducted under the 1968 certificate of designation without requiring that a new certificate be obtained.

If the Commissioners wish to review or halt Colorado Disposal's landfill operation or Metro's sewage sludge operation, they must do so in the context of a revocation or suspension hearing under section 30-20-112 or an injunctive proceeding in a district court of competent jurisdiction under section 30-20-113.

V.

█ Denver contends that the Solid Wastes Act does not apply to it because, as a home rule city, it has exclusive authority over its property, and that delegation of legislative authority to counties to regulate solid waste disposal sites and facilities violates *Colo.Const.* Art. XX and Art. V, Sec. 35. In addition, Denver maintains that it is not a "person" subject to the requirements of the Solid Wastes Act.

Home rule cities under *Colo.Const.* Art. XX[19] have exclusive control only over matters of truly local concern. Statutes dealing with matters of statewide concern supersede local ordinances. *City of Colorado Springs v. State*, Colo., 626 P.2d 1122 (1980); *DURA v. Byrne*, Colo., 618 P.2d 1374 (1980). Location of a waste disposal facility and site affects generators, transporters and disposers of wastes from all over the state, and here, where Denver's waste disposal site is located in Arapahoe County, affects

---

18. Section 30-20-108 provides:
   "(1) An approved solid wastes disposal site and facility may be operated by any person pursuant to contract with any governmental unit.
   (2) Any city, city and county, county, or incorporated town acting by itself or in association with any other such governmental unit may establish and operate an approved site and facility under such terms and conditions as may be approved by the governing bodies of the governmental units involved. In the event

such site and facility is not operated by the governmental unit involved, any contract to operate such a site and facility shall be awarded on a competitive bid basis if there is more than one applicant for a contract to operate such site and facility."

19. Article XX granted to Denver and other municipalities the power of "home rule" through the privilege of adopting charters. *People ex rel. Elder v. Sours*, 31 Colo. 369, 74 P. 167 (1903).

the health and environmental quality of people living outside of Denver. Therefore, the matter is not one which is of purely local concern to Denver, but one which is subject to state-wide regulation under the Solid Wastes Act.

■ Second, Denver argues that the Solid Wastes Act's delegation to a board of county commissioners of the authority to decide whether to allow a waste disposal facility within the county conflicts with Colo.Const. Art. V, Sec. 35.[20] Denver argues that the Arapahoe Board of County Commissioners is a special commission which, by asserting its authority over the Lowry Landfill, is interfering with Denver's property. A board of county commissioners, however, is not a "special commission" under Art. V, Sec. 35. A "special commission" is a "body or association of individuals separate and distinct from the city government; [which] is created for different purposes, or ... for some individual or limited object not connected with the general administration of municipal affairs." *Milheim v. Moffat Tunnel Improvement District*, 72 Colo. 268, 282, 211 P. 649 (1922); *In re Senate Bill Providing the Board of Public Works*, 12 Colo. 188, 21 P. 481 (1888). Like the Tunnel District in *Milheim*, the Arapahoe Board of County Commissioners is the governing body of a district or county through which the usual functions of government are performed. Therefore, a board of county commissioners does not fall within the limitations of a "special commission." In addition, Article V, Section 35 does not prohibit a "special commission" from regulating municipal activities outside the territorial boundaries of the municipality. *City of Loveland v. Public Utilities Commission*, 195 Colo. 298, 580 P.2d 381

(1978); *Robinson v. City of Boulder*, 190 Colo. 357, 547 P.2d 228 (1976). Because the Lowry Landfill is located outside Denver's territorial limits and provides services to persons outside the territorial boundaries of Denver, even were the Board of County Commissioners considered a "special commission" established under the Solid Wastes Act, the Act, giving the Commissioners the right to approve or disapprove of a waste disposal site at the Lowry Landfill, does not violate Article V, Section 35.

■ Finally, Denver argues that it is not a "person" as defined in section 30–20–101(3), C.R.S.1973 (1977 Repl.Vol. 12). However, section 30–20–101(3) defines "person" as "an individual, partnership, private or municipal corporation, firm, or other association of persons." In its complaint in this case, Denver admits that it is a "municipal corporation," and therefore, it is a "person" subject to the provisions of the Solid Wastes Act.

■ Denver's corollary argument is that section 30–20–114 of the Solid Wastes Act contains penal sanctions,[21] which cannot be applied to municipalities, and therefore, the statute does not apply to Denver. For this proposition, Denver cites *Matthews v. Tri-County Water Conservancy District*, Colo., 613 P.2d 889 (1980) where we analyzed the constitution and statutory provisions giving water rate-making authority over "persons" to boards of county commissioners. The question was whether the definition of "persons" to include "corporations and associations" allowed county commissioners to set rates for water conservancy districts, political sub-divisions of the state. We concluded that the inclusion of penal sanctions in the statute was one of many reasons for

---

20. Art. V, Sec. 35 provides: "The general assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatever."

21. Section 30–20–114, C.R.S.1973 (1977 Repl. Vol. 12) provides: "*Violation—penalty.* Any person who violates any provision of this part 1

is guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine of one hundred dollars, or by imprisonment in the county jail for not more than thirty days, or by both such fine and imprisonment. Nothing in this part 1 shall preclude or preempt a city, a city and county, or an incorporated town from enforcement of its local ordinances. Each day of violation shall be deemed a separate offense under this section."

determining that the General Assembly did not intend for political subdivisions to be included within the definition of "persons." *Matthews* does not control the result here because the Solid Wastes Act on its face includes municipal corporations as "persons." Section 30–20–101(3), C.R.S.1973 (1977 Repl.Vol. 12). As a municipal corporation, Denver is subject to the Act.

Judgment reversed and cause remanded to the district court with directions to dismiss the action.