**ANIMAS VALLEY SAND AND GRAVEL, INC., a Colorado corporation, Petitioner/Cross–Respondent,**

v.

**BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF LA PLATA, Colorado, Respondent/Cross–Petitioner.**

No. 00SC151.

Supreme Court of Colorado, En Banc.

Dec. 17, 2001.

Rehearing Denied Jan. 14, 2002.*

---

* Justice KOURLIS would grant the petition.

Abadie & Zimsky, LLC, William E. Zimsky, Durango, CO, Attorneys for Petitioner/Cross-respondent.

Goldman, Robbins & Rogers, LLP, Michael A. Goldman, Jeffrey Robbins, Durango, CO, Attorneys for Respondent/Cross-petitioner.

Carolynne C. White, Denver, CO, Attorney for Amicus Curiae Colorado Municipal League.

Hall & Evans, LLC, Josh A. Marks, Melanie B. Lewis, Denver, CO, Attorneys for Amicus Curiae Colorado Counties Inc.

Grimshaw & Harring, P.C., Wayne B. Schroeder, Denver, CO, Attorneys for Amicus Curiae Peter C. Droste.

Hayes, Phillips & Maloney, P.C., John E. Hayes, Denver, CO, Attorneys for Amicus Curiae American Planning Association.

Bart Miller, Boulder, CO, Attorney for Amicus Curiae (Conservation Group): Clean Water Action (CWA); Colorado Environmental Coalition (CEG); Colorado Wild; CoPIRG Citizen Lobby (CoPIRG); National Audobon Society; San Juan Citizens Alliance (Alliance); Western Colorado Congress (WCC); Western Slope Environmental Resource Council (WSERC).

Chief Justice MULLARKEY delivered the Opinion of the Court.

This case involves the effect of a county land use plan on real property lying within a river valley in La Plata County. The landowner, a sand and gravel company, initiated an inverse condemnation action against the county. The company alleged that the restrictions placed on its property, pursuant to the plan, result in a compensable taking. In this opinion, we apply the United States Supreme Court decision, *Palazzolo v. Rhode Island*, 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001), issued after the court of appeals' decision in this case. *Animas Valley Sand & Gravel, Inc. v. Bd. of County Comm'rs*, 8 P.3d 522 (Colo.App.2000). *Palazzolo* makes clear that a two-tiered takings inquiry applies to a regulatory takings claim. First, a court must determine whether the landowner has proved a per se takings claim either by showing that the regulation has no legitimate purpose, or by showing that the regulation leaves his or her land without reasonable economic value. Second, if a landowner fails to prove a per se taking, the landowner still may be able to prove a taking occurred under a fact-specific inquiry.

Furthermore, in this opinion, we address the appropriate scope of a takings inquiry. We hold that a court must look to the regulation's effect on the entire parcel owned by the landowner. Thus, it is inappropriate to limit a takings inquiry solely to one particular right in the land, or, to a particular part of the land.

Because the court of appeals erred by deciding that the economic viability test is dispositive and by focusing only on the portion of the landowner's property most severely affected by the regulation, we reverse and remand.

I.

In 1961, Animas Valley Sand and Gravel (AVSG) purchased 46.57 acres of real property in La Plata County, Colorado. AVSG intended to use the land for sand, gravel, and heavy mineral mining. At the time of purchase, no county, state, or federal regulations governing sand and gravel operations existed.

In 1979, AVSG divided the original property into two tracts: Tract A, comprising 4.65 acres, and Tract B, comprising 41.92 acres. AVSG then sold Tract A to James Hanks, who is currently the president and majority shareholder of AVSG. Tract B remains under AVSG's ownership and is the parcel at issue here.

In 1993, La Plata County (the county) adopted the Animas Valley Land Use Plan (the plan). The plan sought to regulate development and activities within certain areas out of concern for flood control and also aesthetic concerns likely aimed at increasing tourism. At that time, AVSG had a permit to mine roughly eight acres of Tract B and two acres of Tract A. The county designated these ten acres as "industrial district" land (Industrial property) pursuant to the plan. Under this designation, AVSG is permitted to continue its sand and gravel operation. The county designated the remaining acreage as "river corridor district" land (River Corridor property). Although some agricultural, residential, professional office, and tourism uses are permitted (either by right or by special permit), mining of sand, gravel, and heavy minerals is not permitted on land with this designation.

Following the county's categorization of the parcel, AVSG requested that the county designate all of Tract B, rather than merely eight acres of it, as Industrial property. The county denied this request. AVSG then sought relief in the district court, pursuant to C.R.C.P. 106(a)(4). The district court denied AVSG's request for certiorari relief, as well as its subsequent motion to reconsider. No appeal was taken from this judgment.

Thereafter, AVSG filed a second lawsuit claiming inverse condemnation pursuant to the Colorado Constitution. AVSG asserted that the mineral estate on the thirty-three acres of River Corridor property is rendered economically idle by the plan. In the alternative, AVSG argued that even if a reasonable economic use remains, a compensable taking still should be found under a fact-specific inquiry because the plan goes too far.

After a two-day bench trial, the trial court determined that the plan did not effect a compensable taking. The court focused its inquiry on the River Corridor property but looked at the plan's effect on that property without separating out the effect on the mineral rights. The court determined that a regulation must foreclose all reasonable use of the property for it to effect a taking. It held that because AVSG failed to prove that the plan rendered the River Corridor property economically idle, the plan did not effect a taking.

AVSG appealed the trial court's decision to the court of appeals. The court of appeals agreed with the trial court's definition of the property at issue—agreeing that while certain rights in the land may not be severed, the land may be geographically severed to ascertain the economic viability of the most severely affected portion of the land. *Animas Valley*, 8 P.3d at 525. Moreover, the court agreed with the trial court's determination that a taking can only occur when there is a total deprivation of reasonable use. *Id.* The court of appeals remanded the case, however, because it determined that the trial court may have placed an inappropriate burden of proof on AVSG.[1] *Id.*

AVSG petitioned this court to review the decision of the court of appeals, asserting that the court erred in holding that the economic use test is dispositive in a regulatory takings claim and in refusing to examine mineral rights separately. The county filed a cross-petition asserting that the court of appeals erred in limiting its focus only to the River Corridor property rather than examining the plan's effect on Tract B as a whole. We granted certiorari.[2]

---

1. The court of appeals agreed with both parties that a landowner in an inverse condemnation action has the burden of proving lack of reasonable use by a preponderance of the evidence. The trial court did not specify which burden applied to AVSG. However, it cited cases that applied a clear and convincing standard and that applied a beyond a reasonable doubt standard. Accordingly, the court of appeals remanded, instructing the trial court to clarify the burden to which it held AVSG. This aspect of the court of appeals' decision is not at issue in this appeal.

2. Specifically, this court granted certiorari on the following issues:
 1. Whether a compensable regulatory taking can occur under Colo. Const. art. II, § 15, when the complained of regulation "goes too far" and substantially diminishes the value of the property, even in circumstances where the property retains some economically viable use.
 2. Whether a regulation that prohibits the mining of property constitutes a compensable taking of the property owner's mineral rights under Colo. Const. art. II, § 15.
 3. Whether, in analyzing a portion of property to determine if a land use regulation results in

## II.

■ Inverse condemnation is a claim for relief brought by a landowner against a government defendant in which the landowner seeks compensation for a taking of its property, even though the governmental entity has not instituted formal condemnation proceedings. A taking may be effected by the government's physical occupation of the land or by regulation. While a landowner is not entitled to the most beneficial use of his or her land, *see Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 125, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Goldblatt v. Town of Hempstead,* 369 U.S. 590, 592, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962); *Van Sickle v. Boyes,* 797 P.2d 1267, 1271 (Colo.1990); *Sellon v. City of Manitou Springs,* 745 P.2d 229, 234 (Colo. 1987), extensive regulatory interference warrants compensation.[3] *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922) ("The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking.").

■ Takings jurisprudence balances the competing goals of compensating landowners on whom a significant burden of regulation falls and avoiding prohibitory costs to needed government regulation. *Compare Krupp v. Breckenridge Sanitation Dist.,* 19 P.3d 687, 695 (Colo.2001) ("The Takings Clause assures that the government may not force 'some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' ") (citing *Dolan v. City of Tigard,* 512 U.S. 374, 384, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994)), *with Mahon,* 260 U.S. at 413, 43 S.Ct. 158. ("Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.").

Both the federal and the Colorado constitutions include takings clauses. The federal takings clause provides, "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. This provision is applicable to the states through the Fourteenth Amendment. *Chicago, B. & Q.R. Co. v. Chicago,* 166 U.S. 226, 239, 17 S.Ct. 581, 41 L.Ed. 979 (1887). The Colorado takings clause provides, in relevant part, "[p]rivate property shall not be taken or damaged, for public or private use, without just compensation." Colo. Const. art. II, § 15.

■ Because AVSG brought this claim pursuant to the Colorado Constitution only, it is first necessary to address the scope of Article II, section 15 of the Colorado Constitution as compared to that of the Fifth Amendment of the Federal Constitution. This court has interpreted the "damage" language in Colorado's takings clause to provide broader rights than does the federal clause but only insofar as it allows recovery to landowners whose land has been damaged by "the making of ... public improvements abutting their lands, but whose lands have not been physically taken by the government." *City of Northglenn v. Grynberg,* 846 P.2d 175, 179 (Colo.1993)(applying the "damage" clause to the activities of a government entity on the mineral estate underneath the surface estate owned by the plaintiff landowner). The "damage" clause only applies to situations in which the damage is caused by government activity in areas adjacent to the landowner's land. *See Pub. Serv. Co. of Colo. v. Van Wyk,* 27 P.3d 377, 388 (Colo.2001) (in applying the "damage" clause to an inverse condemnation claim of landowners adjacent to an above ground electric line, noting, "[t]he word 'damaged' is in the Colorado Constitution in order to grant relief to those property owners who have been substantially damaged by public improvements made upon

a "taking," the court must consider the impact of the challenged action on the property as a whole.

3. The record is unclear as to whether the plan is, in effect, a zoning ordinance or a master plan. However, the district court, in the first AVSG suit, noted that the county conceded that the plan is mandatory. In its order, the district

court concluded that "[w]hether zoning or planning, it is clear that the [plan] contain[s] mandatory standards." C.R.C.P. 106(a)(4) *Findings and Order,* 8. The C.R.C.P. 106(a)(4) order was not appealed and the mandatory nature of the plan has not been an issue in the second AVSG suit. Thus, the extent of the binding power of the plan is not at issue here.

land *abutting* their lands, but where no physical taking by the government has occurred") (emphasis added); *Troiano v. Colo. Dep't of Highways,* 170 Colo. 484, 488, 463 P.2d 448, 449 (1969) (applying "the rule long established in Colorado" that there may be recovery "[w]hen damages are occasioned an abutting owner by an improvement in the street in front of his property . . . "); *Harrison v. Denver City Tramway Co.,* 54 Colo. 593, 131 P. 409 (1913) (applying the "damage" clause to the expansion of an electric street car line to a street abutting the plaintiff's land); *City of Pueblo v. Strait,* 20 Colo. 13, 36 P. 789 (1894) (applying the 'damage' clause to the construction of a viaduct abutting the plaintiff's land).

Other than this specific additional coverage, this court has interpreted the Colorado takings clause as consistent with the federal clause. *See Cent. Colo. Water Conservancy Dist. v. Simpson,* 877 P.2d 335, 346 (Colo. 1994). Accordingly, although AVSG does not rest its claim on the Federal Constitution, we look to both Colorado and federal case law for guidance.

### III.

The first issue on which this court granted certiorari is whether there can be a compensable regulatory taking when some economically viable use remains on the property. Like the trial court, the court of appeals determined that the economic viability test is dispositive in a regulatory takings inquiry. *Animas Valley,* 8 P.3d at 525. Although, given the state of the case law at the time, the court of appeals' decision was not unjustified, a recent decision from the United States Supreme Court causes us to conclude that the court of appeals erred in this conclusion. *Palazzolo,* 533 U.S. 606, 121 S.Ct. 2448.

The United States Supreme Court has established two per se tests under which a regulation can effect a taking absent a physical encroachment onto the land. First, a regulation constitutes a per se taking when it "does not substantially advance legitimate state interests." *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1016, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). Second, a per se taking occurs when a regulation

"denies an owner economically viable use of his land." (quotation marks omitted) *Id. See also Keystone,* 480 U.S. at 485, 107 S.Ct. 1232 ("We have held that land use regulation can effect a taking if it 'does not substantially advance legitimate state interests, . . . or denies an owner economically viable use of his land.' ")(alteration in original)(citing *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980)). This second per se rule is at issue here. What has been unclear, until recently, however, is whether, in the absence of a per se taking, there nonetheless can be a taking pursuant to a second, fact intensive, inquiry.

The United States Supreme Court has noted that whether or not a taking has occurred "depends largely 'upon the particular circumstances [in that] case.' " *Penn Cent.,* 438 U.S. at 124, 98 S.Ct. 2646 (alteration in original) (citations omitted). In *Penn Central,* the Court listed the economic impact of the regulation, the regulation's interference with investment-backed expectations, and the character of the governmental action as three such factors (*Penn Central* factors). *Id.* While the Court has referred to these factors in subsequent cases, *see, e.g., Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 495, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987), its inquiry often has focused exclusively on the economic viability of the regulated land. *See, e.g., Lucas,* 505 U.S. 1003, 112 S.Ct. 2886; *Keystone,* 480 U.S. 470, 107 S.Ct. 1232; *Agins v. Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); *Mahon,* 260 U.S. 393, 43 S.Ct. 158.

In the most recent of these cases, *Lucas,* the Court found that the regulation deprived the landowner of reasonable economic value. The Court did imply, however, that in situations in which a reasonable value remains, a second inquiry is appropriate:

[A]n owner [for whom economic value remains] might not be able to claim the benefit of our categorical formulation, but, as we have acknowledged time and again, 'the economic impact of the regulation on the claimant and . . . the extent to which the regulation has interfered with distinct investment-backed expectations' are keenly relevant to takings analysis generally.

(alterations in original) *Lucas,* 505 U.S. at 1019 n. 8, 112 S.Ct. 2886.

The opinions of our court reflect the lack of clarity of the United States Supreme Court decisions. While much of our precedent implies that a regulation does not effect a taking unless there is a nearly complete loss of economic value, *Jafay v. Bd. of County Comm'rs,* 848 P.2d 892, 901 (Colo.1993); *Van Sickle,* 797 P.2d at 1267, one case references an alternate test. In *State, Dep't of Health v. The Mill,* we noted, "[r]egulation which does not prevent all economic use may also constitute a taking if it goes 'too far.' The determination of whether a regulation goes 'too far' ... is essentially an 'ad hoc, factual' inquiry." 887 P.2d 993, 999 (Colo. 1994) (citations omitted).

█ A recent United States Supreme Court decision resolves any doubt that there is a two-tiered inquiry in regulatory takings cases. If a landowner fails to meet its burden of proving a per se taking, it can still prove a taking under a fact-specific inquiry. *Palazzolo,* 533 U.S. 606, 121 S.Ct. 2448.

In *Palazzolo,* the petitioner claimed a regulatory taking after the State of Rhode Island designated his land as coastal wetlands property. The trial court rejected his claim and the Rhode Island Supreme Court affirmed. *Palazzolo v. State,* 746 A.2d 707 (R.I.2000). One of the bases for the state supreme court's conclusion was that under the wetlands designation, the land retained a value of $200,000 and thus the regulation did not render the land valueless. The United States Supreme Court affirmed the state court's determination that an economically viable use of the land remained. Nonetheless, the Court remanded the case for further determination under a fact-specific inquiry to complete the analysis. *Palazzolo,* 121 S.Ct. at 2465. The Court noted:

> Where a regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending on a complex of factors including the regulation's economic effect on the landowner,

the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action.

*Id.* at 2457 (citing *Penn Cent.,* 438 U.S. at 124, 98 S.Ct. 2646).

Thus, *Palazzolo* endorses a two-tiered inquiry in a regulatory inverse condemnation claim. First, a court must determine whether a per se taking has occurred. Second, if a landowner is unable to prove a per se compensable takings claim (because the regulation has a legitimate purpose and her land has not been rendered economically idle), the landowner still may be able to prove a taking has occurred under a fact-specific inquiry.

█ Although the *Palazzolo* Court did not address what level of interference a government regulation must have caused to constitute a taking under a fact-specific inquiry, a mere decrease in property value is not enough. This is true because a landowner is not entitled to the highest and best use of his property.[4] Reading *Palazzolo* together with the Court's prior precedent, it is apparent that the level of interference must be very high.

We draw this conclusion from several sources. First, we point to Justice Holmes's famous dictum that permits regulation without compensation unless the regulation goes "too far." *Mahon,* 260 U.S. at 415, 43 S.Ct. 158. Second, we note that the likely purpose of the fact-specific test is to provide an avenue of redress for a landowner whose property retains value that is slightly greater than de minimis. *See Lucas,* 505 U.S. at 1019 n. 8, 112 S.Ct. 2886 (in which the Court references the *Penn Central* factors in response to the dissent's criticism that under the economic viability test " '[the] landowner whose property is diminished in value 95% recovers nothing,' while the landowner who suffers a complete elimination of value 'recovers the land's full value.' " (alterations in original)). Third, we look to a number of cases in which the Court determined that even a significant reduction in the value of

---

4. *See Penn Cent.,* 438 U.S. at 125, 98 S.Ct. 2646; *Goldblatt,* 369 U.S. at 592, 82 S.Ct. 987; *Van*

*Sickle,* 797 P.2d at 1271; *Sellon,* 745 P.2d at 234.

land did not amount to a taking. *See, e.g., Agins,* 447 U.S. 255, 100 S.Ct. 2138 (no taking with an eighty-five percent reduction in value); *Vill. of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (no taking with a seventy-five percent reduction in value); *Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915)(no taking with a 92.5% diminution in value). Finally, we note that in *Palazzolo,* the Court ordered a fact-specific inquiry when the regulation diminished the value of the petitioner's land by over ninety-three percent. 121 S.Ct. at 2456, 2457.

▆ Thus, the Court's current formulation of the fact-specific inquiry seems to contemplate a situation in which the property in question retains more than a de minimis value but, when its diminished economic value is considered in connection with other factors, the property effectively has been taken from its owner. It provides a safety valve to protect the landowner in the truly unusual case.

The present case must be retried because the trial court determined, prior to trial, that the economic use test was dispositive. A new trial will permit the district court to apply the proper legal test and the parties to present evidence relevant to the ad hoc factual inquiry. Although there is ample evidence in the record to establish the nature of the regulation,[5] the other factors are not well developed and AVSG has had no opportunity to prove their relevance.

▆ The two *Penn Central* factors on which more evidence is needed are the economic impact of the plan, and the plan's impact on investment-backed expectations. First, as a threshold matter, it is unclear whether the plan itself has had any economic impact on AVSG's land.[6] The extent to which the sand and gravel industry has been regulated independent of the plan must be established.[7] The record reveals that AVSG has operated under a permit since 1985. There is no evidence, however, regarding how long and to what extent the sand and gravel industry, in particular, and land use, in general, has had to conform to regulations in Animas Valley. The trial court must determine to what degree the current restrictions on AVSG's property are attributable to the plan rather than to the accumulated state and federal regulations of the past several decades that have arisen from both a growing population and an increased awareness of the environmental consequences of industry.

Assuming at least some restriction can be attributed to the plan, the trial court must then quantify the resulting diminution in value, if any, of the property. The court must ascertain the net value of the land's use before and after the plan, and compare these two values. It is not enough to simply quantify the value of the sand and gravel deposits that could not be mined as a result of the plan. Rather, the court must measure the diminution, if any, in the fair market value caused by the regulatory imposition. *See* 2A Julius L. Sackman, *Nichols On Eminent Domain* § 12.01 (3d ed.2001).

5. This factor weighs in favor of the county. The record shows that there was no physical invasion of AVSG's property and that the plan serves a legitimate governmental purpose. In addition, the plan was properly adopted after public hearings in which AVSG participated. *See Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 434–45, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (examining whether there is a physical occupation of the landowner's property); *Keystone,* 480 U.S. at 485, 107 S.Ct. 1232 (examining whether there is a legitimate public purpose behind the regulation); *Dist. Intown Prop. Ltd. P'ship v. Dist. of Columbia,* 198 F.3d 874, 879 (D.C.Cir.1999) (limiting its inquiry of the "nature of the government interest" to whether there was a physical intrusion and whether the regulation was for a legitimate governmental purpose).

6. It is undisputed that the plan allows precisely the same use of AVSG's land as had occurred prior to the plan's enactment. *See Esposito v. South Carolina Coastal Council,* 939 F.2d 165, 170 (4th Cir.1991) (noting that whether the regulation affects the existing use of the property is significant in determining the regulation's economic impact).

7. In weighing the significance of past regulation, the trial court should keep in mind that the United States Supreme Court has noted that landowners cannot establish a takings claim "simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development ... ". *Penn Cent.,* 438 U.S. at 130, 98 S.Ct. 2646.

Second, if AVSG is able to prove a diminution in value that is both substantial and attributable to the plan, AVSG will then need to prove that its reasonable investment-backed expectations were adversely impacted by the plan. There is a dispute regarding the long-range investment expectations of AVSG. While the county presented evidence that, since the retirement of the founder, AVSG has become a small-time "one-retiree operation," AVSG presented evidence that the company had larger plans. The trial court must make findings of fact resolving this issue and must determine if AVSG had a reasonable expectation that it could mine areas other than the land already permitted to be mined.

AVSG and the county may chose to raise other factors for the trial court's consideration.[8] While the Court in *Palazzolo* lists the *Penn Central* factors as the relevant focus of an ad hoc, factual inquiry, 121 S.Ct. at 2457, *Penn Central* itself stresses that although these factors have "particular significance," there is no "set formula" for determining when a compensable regulatory taking has been effected. 438 U.S. at 124, 98 S.Ct. 2646. Justice O'Connor's concurrence in *Palazzolo* emphasizes that "*Penn Central* does not supply mathematically precise variables, but instead provides important guideposts that lead to the ultimate determination whether just compensation is required." 121 S.Ct. at 2466 (O'Connor, J., concurring). Thus, no one factor is dispositive. Each case must be decided on its own facts.

In sum, if AVSG is to prevail, it must show that it falls into the rare category of a landowner whose land has a value slightly greater than de minimis but, nonetheless, given the totality of the circumstances, has had its land taken by a government regulation.

## IV.

The second and third issues on which we granted certiorari deal with the definition of the property interest at stake. Because both the per se economic viability test and the *Penn Central* factual test involve a compara-

tive analysis between the value of the property before and after the regulation, the definition of the relevant parcel of land is key to the inquiry. *See Keystone*, 480 U.S. at 496, 107 S.Ct. 1232 ("Because our test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property, one of the critical questions is determining how to define the unit of property 'whose value is to furnish the denominator of the fraction.' ")(quoting Frank Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law*, 80 Harv. L.Rev. 1165, 1192 (1967)); Jan G. Laitos, *Law of Property Rights Protection* § 2.01[C] (1999) (noting that "[o]ne critical threshold issue for takings cases is ascertaining the size of the property affected by the police power").

AVSG suggests that in defining the relevant portion of the property, two forms of conceptual severance are appropriate: first, a geographical severance separating out the thirty-three acres of River Corridor property from Tract B as a whole; second, a rights severance, separating out the mineral rights from the full bundle of rights in the land. Conversely, the county claims that the appropriate scope of a takings inquiry is the entire parcel that the landowner owns.

Both the trial court and the court of appeals held that the appropriate scope of the takings inquiry is the full "bundle" of property rights, rather than simply the mineral rights. However, these courts did sever conceptually the acreage of the property—focusing only on the thirty-three acres of River Corridor property without regard to the remainder of Tract B.

We agree that mineral rights should not be considered in isolation. However, because we hold that the appropriate scope of a takings inquiry is the entire parcel of property owned by AVSG, we find that the court of appeals and trial court erred in limiting the focus of their inquiries to merely the River Corridor property.

8. For example, the county may assert that AVSG gained benefits from the implementation of the plan (often termed, "average reciprocity of ad-

vantage"). *See Dolan*, 512 U.S. at 408, 114 S.Ct. 2309; *Hodel v. Irving*, 481 U.S. 704, 715, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987).

### A.

First, AVSG asserts that in assessing whether or not a regulation has effected a taking, it is appropriate to examine the regulation's effect on one distinct right in the property (in this case, mineral rights) rather than on the entire bundle of rights. The trial court and court of appeals in this case rejected this argument. We agree.

The United States Supreme Court has consistently held that in a regulatory takings case, a court must determine the regulation's effect on the full rights in the land.

In *Penn Central*, the landowner asserted that because New York City's Landmarks Preservation Law significantly reduced its ability to build on top of Grand Central Terminal, the law effected a compensable taking of its land. In addressing the appropriate scope of the takings inquiry, the landowner argued that the Court should ascertain the law's effect on one aspect of the property interest, i.e., the airspace above the terminal. The Court rejected such a conceptual severance as "quite simply untenable." *Penn Cent.*, 438 U.S. at 130, 98 S.Ct. 2646; *see also Andrus v. Allard*, 444 U.S. 51, 65–66, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979) (noting that, "where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety"); *Clajon v. Petera*, 70 F.3d 1566, 1577 (10th Cir.1995) (refusing to separate out just one stick (hunting rights) in the bundle of rights in an inverse condemnation action).

The Court applied the same reasoning in *Keystone*. There, the petitioners, an association of coal mining companies, claimed that Pennsylvania's Bituminous Mine Subsidence and Land Conservation Act effected a regulatory taking of their property. The act, in part, required coal mining companies to leave at least fifty percent of the coal beneath certain protected structures in place to ensure proper surface support so that the land would not subside. *Keystone*, 480 U.S. at 476–77, 107 S.Ct. 1232. Petitioners claimed that this act effected a taking of the support estate—defined as consisting of the right to remove the strata of coal and earth that undergird the surface or to leave those layers intact to support the surface and prevent subsidence. *Id.* at 498, 107 S.Ct. 1232. The petitioners urged the Court to ascertain the act's effect on the support estate of the land, rather than on the land as a whole. *Id.* at 479, 107 S.Ct. 1232. The Court concluded that even though Pennsylvania property law regards the support estate as a separate interest in land that can be conveyed on its own, "takings jurisprudence forecloses reliance on such legalistic distinctions within a bundle of property rights." [9] *Id.* at 498, 107 S.Ct. 1232.

■ Thus, in this case, the trial court and court of appeals were correct in holding that the appropriate focus of a takings inquiry is the property rights as an aggregate rather than merely the mineral rights.

### B.

■ Second, AVSG contends that in assessing the economic effect of the plan, a court should look to the diminution in value of only the thirty-three acres designated as River Corridor property rather than of the entirety of Tract B. Both the trial court and the court of appeals agreed with AVSG and identified the River Corridor property as the relevant focus of the takings inquiry. This was in error. The appropriate "denominator" for determining the economic impact of a regulation is the contiguous parcel of property owned by the landowner, not merely the segment most severely affected.

---

**9.** A footnote in *Lucas* may leave the door open to rights severance if the right at issue is fundamental. In a discussion of the "denominator question," the Court notes:

> The answer to this difficult question may lie in how the owner's reasonable expectations have been shaped by the State's law of property— i.e., whether and to what degree the State's law has accorded legal recognition and protection to the particular interest in land with respect to which the takings claimant alleges a diminution in (or elimination of) value."

*Lucas*, 505 U.S. at 1016 n. 7, 112 S.Ct. 2886.; *see also*, Laitos, *supra* at § 11.03[C] (recognizing an exception for a "critical stick," such as the right to sell). Precisely which rights may fit this exception is not before us in the current case. The precedent is clear that mineral rights may not be severed.

The United States Supreme Court has held that in assessing a takings claim, a court must look to the regulation's effect on the property as a whole:

> 'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole. . . .

*Penn Cent.*, 438 U.S. at 130–31, 98 S.Ct. 2646; *see also Colo. Water*, 877 P.2d at 347 (citing, with approval, this language from *Penn Central*). Moreover, in *Dolan*, in discussing whether an exaction would deprive the landowner of all economic use, the Court examined the value of the property as a whole—not simply the portion affected by the exaction. *Dolan*, 512 U.S. at 385 n. 6, 114 S.Ct. 2309.

 Thus, in determining the economic ramifications of a regulatory act, a court must look at the contiguous parcel of land owned by the petitioner, not merely the portion most drastically affected by the regulation. Were we to accept AVSG's position that a court should evaluate the effect of a regulation with respect to only one segment of the parcel, virtually any land use regulation would effect a taking if the landowner defined the relevant parcel small enough. For example, were partitioning allowed, a zoning ordinance that required a setback would effect a taking of the land between the lot line and the building line. Such a regime would defeat the balance of interests reached in takings jurisprudence. *Accord Keystone*, 480 U.S. at 496, 107 S.Ct. 1232 (noting that in a takings regime in which geographical severance is permitted, "[a] requirement that a building occupy no more than a specified percentage of the lot on which it is located could be characterized as a taking of the vacant area").

10. It is highly unlikely that the trial court's finding that the plan did not effect a per se taking will be altered by the additional consideration of the Industrial property. If land that includes

Nonetheless, AVSG claims that such a partition is appropriate because the River Corridor property is the only portion affected by the plan. This characterization is incorrect. The county regulated the entire forty-four acres of Tract B under the plan. To segment out only the portion most adversely affected by the plan would be to ignore the possibility that the county designated eight acres as Industrial property precisely to allow AVSG an economically viable use of Tract B.

Thus, the trial court and the court of appeals erred in identifying only the River Corridor property rather than Tract B in its entirety as the relevant parcel of land.[10]

## V.

For the reasons discussed above, we reverse the court of appeals and remand this case for return to the trial court. On remand, the trial court is directed to retry the case and apply the fact-specific inquiry to Tract B in its entirety.

Justice KOURLIS specially concurring:

I join the majority's conclusion that this case must be remanded to the trial court for a new trial under the correct legal standard. However, I disagree with the majority's construction of that standard. First, I would apply the Colorado Constitution and would not limit it as the majority does. Second, even under federal law, I suggest that the majority has imposed unwarranted restrictions on the applicable test for determining when a regulation works a taking. Accordingly, I respectfully concur in the result of the majority opinion, but write separately to identify my concerns.

## I.

The undisputed facts of this case demonstrate that before the Board of County Commissioners of La Plata County (the Board) adopted the Animas Valley Land Use Plan (the Plan), Animas Valley Sand & Gravel,

only the River Corridor property remains economically viable, surely land containing the River Corridor property *and* the Industrial property is economically viable as well.

Inc. (AVSG) owned property rich in sand and gravel deposits that AVSG intended, in the future, to extract. After the adoption of the Plan, AVSG was no longer entitled to make that use of its property. The Board adopted the Plan for the public benefit in order to protect the riparian and wildlife habitat of the Animas River, to provide a safety net for flood damage, and to promote a scenic corridor in the Animas Valley—unmarred by an unsightly gravel operation.

The trial court bifurcated the proceedings and first addressed the question of whether there had been a taking, leaving the issue of damages and just compensation for a possible later trial—which never occurred. In the first trial, the trial court required AVSG to prove that, after the adoption of the Plan, there was *no* reasonable use remaining on the AVSG property.

The trial court did not address reasonable investment-backed expectations in the property, as measured by the feasibility of additional sand and gravel mining; and the trial court did not permit AVSG to introduce evidence concerning the value of its property before adoption of the Plan and after adoption of the Plan. The trial court erred as a matter of law, and the court of appeals upheld that error. The majority correctly remands the case back to the trial court to correct those errors.

## II.

Initially, however, I differ with the majority's reading of the Colorado Constitution. As the majority recites, Article II, section 15 of the Colorado Constitution provides that "[p]rivate property shall not be taken or damaged, for public or private use, without just compensation." Its federal counterpart contains no reference to "damage." *See* U.S. Const. amend. V.

When the state constitution differs in language or in historical context from the United States Constitution—and only in those instances—this court should give effect and has historically given effect to the differences. At the time of drafting of our constitution, Colorado still had land available for homesteading. We were primarily agricul-

tural and populated by individuals who were attracted to open spaces and opportunity—in the form of property rights.

Within that framework, this court has, for over a century, concluded that our constitution provides broader protection to private property rights than does the United States Constitution. *E.g., Cent. Colo. Water Conservancy Dist. v. Simpson,* 877 P.2d 335, 347 (Colo.1994) (citing the established "principle that the takings clause of our constitution prohibits governmental conduct that might not be deemed a taking for purposes of the federal Constitution"). In the first case to address the provision, *City of Denver v. Bayer,* 7 Colo. 113, 118, 2 P. 6, 9 (1883), the court granted damages to a plaintiff whose property had been damaged by the construction of a railway on an abutting street. The court accepted that the word "taking" might well be limited to a physical invasion or possession, but that "damage" could not be so limited. *Id.* at 120, 2 P. at 10. Rather, after surveying the law from which the constitutional provision was apparently borrowed, the court clearly concluded that our constitution required compensation to an owner of property for the actions of the government that impaired the value of that property disproportionately. *Id.* at 124, 2 P. at 12. The measure of compensation allocable to such injury was identified as "the actual diminution in the market value of his premises, for any use to which they may reasonably be put, occasioned by the construction and operation of the railroad through the adjacent street." *Id.* at 127–28, 2 P. at 15.

In 1894, the court reiterated that the purpose of inserting "damaged" in the constitution was to add an additional right of action for landowners. *City of Pueblo v. Strait,* 20 Colo. 13, 18, 36 P. 789, 791 (1894). Further, in *Harrison v. Denver City Tramway Co.,* 54 Colo. 593, 597, 131 P. 409, 411 (1913), the court held that a plaintiff was entitled to compensation when

some right in, user of, or interest pertaining to property ... has been wholly or partially destroyed.... The right disturbed may be either public or private, but it must be a right which she enjoyed in connection with her property, and which

gave to it an additional value, and without which, or as affected by the disturbance, the property itself is damaged. The disturbance of the right or easement may be at a distance from the property injured, but the interference must be with some right held with regard to that property.

Hence, we have a rich history of interpreting our constitution to provide broad protection to private property interests. The majority construes that case law in a very limiting fashion so as to constrain the "damage" clause of the Colorado Constitution solely to those instances where landowners claim that they have been damaged by governmental invasion or possession of abutting lands, without any physical taking of their own property. *See* maj. op. at 63. For that proposition, the majority cites *City of Northglenn v. Grynberg,* 846 P.2d 175 (Colo.1993), a case in which this court declined to find a taking when Northglenn acquired the surface estate overlying Grynberg's coal lease and drilled a core hole into that leasehold, which demonstrated that there were no commercially exploitable coal reserves in the lease. On the question of whether Northglenn had "damaged" Grynberg (as distinguished from taking something from him), the court held that

> Northglenn did nothing which would have impaired Grynberg's exploration for or mining of coal in the coal lease.
>
> Furthermore, there is no evidence that Northglenn obstructed Grynberg's ingress or egress to his property. There is no evidence that Northglenn's acts affected a right or interest he enjoyed in connection with his property which is not shared with or enjoyed by the public generally. In other words, the law of constitutional damagings does not apply to the undisputed facts of this case.

*Grynberg,* 846 P.2d at 185.

Hence, although the majority here cites *Grynberg* for the proposition that the "damage" clause of the Colorado Constitution is limited to a narrow area of damage visited upon property abutting a governmental activity, in fact, the court applied that clause much more broadly in *Grynberg* to analyze just the issues that I suggest courts should appropriately analyze.

Indeed, in *Simpson,* we cited *Grynberg* for the proposition that the takings clause of our constitution prohibits governmental conduct that might not be deemed a taking for purposes of the federal constitution because the "Colorado Constitution permits property owners whose property is substantially damaged by governmental action to obtain legal redress for such damage even though the action does not constitute a physical invasion of the property." *Simpson,* 877 P.2d at 347.

Colorado has long recognized that a property owner who has suffered damage to his rights of ownership or use by operation of governmental action in a manner that differs in kind from that suffered by the public generally is entitled to compensation. The damage must differ in kind, not merely in degree. *Gilbert v. Greeley, S.L. & P. Ry.,* 13 Colo. 501, 510, 22 P. 814, 817 (1889). The right for which compensation is awarded should be a right that gives the property additional value and by the disturbance of which the property itself is devalued. *Harrison,* 54 Colo. at 597, 131 P. at 411. Lastly, the measure of damages is quite simply the difference in market value of the property before and after the government action. *Dandrea v. Bd. of County Comm'rs,* 144 Colo. 343, 348, 356 P.2d 893, 896 (1960).

We are bound by that precedent. Under that case law, AVSG need only produce evidence that its vested rights were damaged by the Plan and the value of its property was accordingly diminished. John J. Delaney & Emily J. Vaias, *Recognizing Vested Development Rights as Protected Property in Fifth Amendment Due Process and Takings Claims,* 49 Wash. U.J. Urb. & Contemp. L. 27, 38 (1996).

### III.

More broadly, even if this case is governed by federal law, I would offer broader and more complete directions to the trial court concerning the application of *Palazzolo v. Rhode Island,* 533 U.S. 606, 121 S.Ct. 2448, 2457–58, 150 L.Ed.2d 592 (2001), decided by the United States Supreme Court last Term.

## A.

I do agree that *Palazzolo* specifically clarifies that courts are to evaluate regulatory action at two levels: first, if the action denies all economically productive or beneficial use of the land, it is a per se taking that requires compensation. *Id.* at 2457. Second, even if the action does not go that far, but does economically affect the landowner and interfere with the landowner's reasonable investment-backed expectations, it may nonetheless be a compensable taking depending upon various factors. *Id.* As to this latter category, the Court concluded that such an "ad hoc" inquiry is mandated by the purpose of the Takings Clause, which is "to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Id.* at 2457–58 (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)).

The majority in *Palazzolo* remanded that case to the trial court to enable the landowner to attempt to establish a compensable taking under the second, fact-specific inquiry. *Palazzolo,* 121 S.Ct. at 2465. The Court did not set out a comprehensive test to govern that determination, and also did not resolve the issue of what the "proper denominator" should be in a takings case—or, stated otherwise, what the courts should use as the landowner's property interest to be examined in determining value before damage, but rather specifically declined to address that issue. *Id.*

Accordingly, I suggest that the majority here is correct in answering the first question on which we accepted certiorari in the affirmative. Even in federal law, after *Palazzolo,* it is clear that there may, indeed, be a compensable, regulatory taking when some economically viable use remains on the property. *Palazzolo,* 121 S.Ct. at 2457. However, the majority greatly limits *Palazzolo* by concluding that the "ad hoc" test only addresses the rare situation where a landowner "whose land has a value slightly greater than de minimis" is entitled to compensation. *See*

maj. op. at 65. I agree that the appropriate test for measuring the landowner's entitlement to compensation includes: (i) the economic impact of the plan; (ii) the plan's impact on investment-backed expectations; and (iii) the net value of the land before and after the plan. I do not agree that such a formulation then leads only to compensation in rare circumstances where the landowner is left with next to nothing. In fact, in my view, *Palazzolo* specifically rejected that approach as the "per se" approach, and broadened both the inquiry and the class of compensable takings accordingly.

## B.

Other courts that have addressed *Palazzolo* have taken a broad approach. Two cases are, perhaps, relevant as we attempt to determine how to apply *Palazzolo.* The Alaska Supreme Court decided a case recently in which it held that a landowner was not entitled to compensation for damage caused to his right to develop a twenty-foot strip of land adjacent to a regulated wetlands setback area. *R & Y, Inc. v. Municipality of Anchorage,* 34 P.3d 289, 300, 2001 Alas. LEXIS 122, at *38 (Alaska 2001). The court applied the Alaska Constitution,[1] noting that both the United States Constitution and the Alaska Constitution required the "ad hoc" factual analysis discussed in *Palazzolo.* *Id.* at 293. Courts in Alaska engaging in the "ad hoc," case-specific analysis consider four factors: (1) the character of the governmental action; (2) its economic impact; (3) its interference with reasonable investment-backed expectations; and (4) the legitimacy of the interest advanced by the regulation or land-use decision. *Id.* The supreme court determined that the trial court had properly allowed the landowner to present evidence on all four factors and that the trial court had then found that the landowner failed to prove any real diminution in value of his land as a result of the regulations at issue. *Id.* at 296. The court upheld those findings and conclusions as supported by the evidence. *Id.* at

---

1. Article I, section 18 of the Alaska Constitution contains the same provision that "private property shall be taken or damaged for public use without just compensation" as does our constitution.

300. Neither the trial court nor the supreme court required the landowner to demonstrate that his land had only a "de minimis" value or that all reasonable use of his property had been eliminated; rather, they both applied the more expansive test, but concluded that the landowner had failed in his burden. *Id.*

In a California Court of Appeal's case, *Cwynar v. City & County of San Francisco,* 90 Cal.App.4th 637, 109 Cal.Rptr.2d 233 (2001), *review denied,* 2001 Cal. LEXIS 6617 (Cal. Sept. 26, 2001), that court considered a challenge to an ordinance that restricted a property owner's ability to evict a tenant from a residential rental unit so that the property owner or a close family member could occupy the unit. The plaintiffs sued the City and County of San Francisco for, among other claims, inverse condemnation. *Id.* at 240. The California Constitution parallels the United States Constitution and provides compensation only for takings, but the court of appeal observed that under both the federal, citing *Palazzolo,* and state constitutions, courts must engage in an "ad hoc" analysis to determine whether a taking has occurred. *Id.* at 250. That court focused on two factors: the government's purpose for enacting the regulation; and second, the impact of the regulation on the property owner—to be evaluated under a thirteen-step test. *Id.* at 253. The test factors included: (1) whether the regulation affects the present or past use of the property, thus interfering with the owner's primary expectation; (2) whether the regulation permits the property owner to profit and benefit from a reasonable return on his investment; (3) whether the regulation affords the property owner benefits and rights mitigating the financial burdens the law has imposed; (4) whether the regulation prohibits the most beneficial use of the land; and (5) whether the regulation nullifies a fundamental attribute of ownership. *Id.* at 253 n. 9. In the end, the court concluded that the plaintiffs had sufficiently alleged that the regulation fundamentally changed and restricted the use of their residential real property, and that they had sufficiently alleged a disproportionate impact from the regulation by reason of being unable to inhabit their own apartments in order to accommodate public housing needs. *Id.* at 255. Such allegations were sufficient to survive demurrer, and the court sent the case back for further fact-finding. *Id.* at 256.

Thus, the two courts that have applied *Palazzolo* since its announcement have both concluded that the inquiry should be broad and inclusive. I would urge a similar application here, which would give the trial court tools with which to measure the impact of any taking.

### C.

I also note that the adoption by the United States Supreme Court of the second portion of the inquiry in a takings case greatly diminishes the importance of the "denominator" question, and under both state and federal law, we need not wade into that quagmire. Prior to *Palazzolo,* under *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), federal law provided that a taking occurs when the regulation "denies all economically beneficial or productive use of land." Under that formulation, therefore, a court had to compare the loss of property use precluded by a regulation with all use rights in that property in order to determine whether the taking was compensable. The resulting struggle rested in the definition of the relevant property interest. For example, if the relevant property interest were defined narrowly enough, then a taking would always occur. On the other hand, if it were defined broadly enough, a taking would never occur. *See* John E. Fee, *Unearthing the Denominator in Regulatory Taking Claims,* 61 U. Chi. L.Rev. 1535, 1536 (1994). Here, the example would be that if AVSG defined the relevant property interest as its right to mine sand and gravel, or its mineral estate in sand and gravel, then the estate was fully taken by the regulation, and compensation would be due. If, on the other hand, the Board defined the interest as all property AVSG or its affiliates owned in the county, then the mineral interests in a portion of one tract would certainly not be "all beneficial or productive use" of AVSG land,

and therefore compensation would not be due.

I suggest that *Palazzolo* rightfully eliminates that shell game from the process of determining whether a governmental regulation "goes too far," and suggests a different approach completely. Under *Palazzolo*, a regulation can go too far if it economically affects the landowner and impacts reasonable investment-backed expectations: it no longer need work a taking of all economically viable uses. *Palazzolo*, 121 S.Ct. at 2457. For example, a landowner who owns a fee surface and mineral estate whose mineral estate is completely taken by operation of government regulation will be treated by the courts the same way as a mineral owner who owns no surface estate but who is similarly deprived of the mineral estate by government regulation. It is not the cumulative number of sticks in the bundle of property rights that should affect the question of whether one right has been wholly or partially taken. Rather, it is the question of whether the right that is taken results in real economic damage—not blue sky speculative damage.

### D.

An additional factor that a court must consider in assessing a takings claim in this context is the legitimacy of the governmental action itself. *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). The majority concludes that there is ample evidence in the record to establish the legitimacy of the Plan and concludes that this factor weighs in favor of the county. *See* maj. op. at 66 & n. 5. In my view, the trial court should revisit that question and assess whether the county correctly treated the master plan as binding. I resist the assumption that the Board has any right to impose upon or regulate use of private property by means of a master plan.

A master plan is the broadest of all planning tools available to local governmental entities. It is intended to encourage visionary thinking, which contemplates and designates in a descriptive and explanatory manner the general location of various uses within the county. § 30–28–106(3), 9 C.R.S. (2001). A master plan "is advisory only," § 30–28–106(3)(f), and this court has specifically observed that master plans are not the equivalent of zoning, nor binding upon the zoning authority. *Theobald v. Bd. of County Comm'rs*, 644 P.2d 942, 948–49 (Colo.1982) (holding that "[c]onceptually, a master plan is a guide to development rather than an instrument to control land use," and describing a master plan as a "recommendation of the most desirable use of land" that is "generally held to be advisory only"). A master plan can have no regulatory effect unless or until it is implemented through zoning or through a Planned Unit Development. *Theobald*, 644 P.2d at 950; *see generally Beaver Meadows v. Bd. of County Comm'rs*, 709 P.2d 928 (Colo.1985).

In this case, the Plan deprived AVSG of any right to continue the extraction of sand and gravel at any time, rather than merely restricting some speculative prospective use. Further, the Plan was not adopted as a part of any specific and exact zoning or subdivision regulation. Hence, the trial court should carefully examine the legitimacy of the governmental action based on whether the master plan properly governed the use of AVSG's property, absent further implementing regulation or zoning.

### IV.

In conclusion, I suggest that the majority appears to hold AVSG to a standard more akin to a per se takings analysis, warranted neither by the United States nor Colorado Constitutions. In my view, on remand, the trial court should consider the legitimacy of the governmental action in light of the nonbinding status of a master plan. Further, the trial court should determine the value of the entire property owned by AVSG and contained within the River District both before and after the Plan's adoption. If there is a diminution in value after adoption, the trial court should then determine: (i) whether the diminution is attributable to the Plan; and (ii) whether the diminution relates to AVSG's reasonable investment-backed expectations. If the answer to both of those questions is yes, then AVSG should be awarded the difference in value as a compensable inverse condemnation of certain uses of its

property. I therefore specially concur in the majority's judgment only.

I am authorized to state that Justice COATS joins in this special concurrence.