23CA0993 Heartland v CDPHE 05-22-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA0993
City and County of Denver District Court No. 17CV32604
Honorable Jill D. Dorancy, Judge

Heartland Biogas, LLC,

Plaintiff-Appellant,

v.

Colorado Department of Public Health and Environment and Weld County
Board of County Commissioners,

Defendants-Appellees.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE JOHNSON
Fox and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 22, 2025

Holland & Hart LLP, Stephen G. Masciocchi, Jessica J. Smith, Denver,
Colorado, for Plaintiff-Appellant

Philip J. Weiser, Attorney General, Fredrick C. Haines, Senior Litigation
Counsel & Assistant Solicitor General, Allison R. Ailer, Senior Assistant
Attorney General, Joseph G. Michaels, Assistant Solicitor General, Denver,
Colorado, for Defendant-Appellee Colorado Department of Public Health and
Environment

Hall & Evans, L.L.C., Mathew J. Hegarty, Alexandria L. Bell, Denver, Colorado,
for Defendant-Appellee Weld County Board of County Commissioners

¶ 1    Plaintiff, Heartland Biogas, LLC (Heartland), appeals the district court's judgment finding in favor of defendants, Colorado Department of Public Health and Environment (CDPHE) and Weld County Board of County Commissioners (BOCC).  Heartland sued CDPHE and BOCC contending that both entities took without just compensation its Certificate of Designation (Designation), and by extension, its Use by Special Review Permit 1704 (Permit 1704), as well as its Certificate of Registration 9931 (Registration 9931),[1] causing Heartland to close its facility so that those entities also took without just compensation Heartland's property interest in its land improvements.

¶ 2    Although Heartland requested a jury trial, CDPHE and BOCC asked the court to hold a bench trial because Heartland's remaining claims at the time of trial concerned regulatory takings.  The court agreed.  Also before trial, CDPHE and BOCC disclosed new witnesses to testify at trial, and the court allowed those witnesses to

---

[1] The parties used a variety of acronyms to refer to various terms. To avoid an opinion of alphabet soup, we may use different abbreviations.

testify even though Heartland argued that the disclosures were untimely.

¶ 3　Following a multiple-day bench trial, the district court issued a lengthy order finding that (1) Heartland did not have a designation; (2) CDPHE's and BOCC's actions were not regulatory takings per se or takings under the factual inquiry in *Palazzolo v. Rhode Island*, 533 U.S. 606 (2001); and (3) BOCC validly exercised its police power by indefinitely suspending Permit 1704.

¶ 4　On appeal, Heartland contends that the district court erred because (1) Heartland was entitled to a jury trial; (2) Heartland had a designation and, thus, a protected property interest; (3) CDPHE's and BOCC's actions forcing Heartland's facility to close constituted regulatory takings; (4) BOCC's exercise of its police power had no bearing on Heartland's takings claims, and regardless, the BOCC invalidly exercised its police power by shutting down the facility; and (5) the court abused its discretion by allowing some of the late-disclosed witnesses to testify at trial.  We affirm.

## I.　Background

¶ 5　In 2009, Shelton Land and Cattle, Ltd. (Shelton) owned property in Weld County and leased it to Heartland Renewable

Energy, LLC (Heartland Renewable), which has no relationship to Heartland. In April 2009, Heartland Renewable applied for a designation with CDPHE and BOCC to operate a solid waste disposal site and facility on the property. Heartland Renewable hired AGProfessionals, LLC, an engineering development company (consulting firm), to assist with the regulatory process. As part of its application, Heartland Renewable, through its consulting firm, submitted a proposed Engineering, Design, and Operations Plan (the 2010 EDOP) to CDPHE for that agency's review. The 2010 EDOP governs operation of the facility.

¶ 6     Heartland Renewable's facility proposed to use manure and food waste — also referred to as substrates — to create three products: renewable natural gas (through an anaerobic digestion process),[2] compost (from the facility's digested solids), and liquid soil amendment or LSA (from the facility's effluent, which is the

---

[2] "Anaerobic digestion is a process through which bacteria break down organic matter — such as animal manure, wastewater biosolids, and food wastes — in the absence of oxygen." *Lambland, Inc. v. Heartland Biogas, LLC*, No. 22-1184, 2023 WL 8276140, at *1 n.1 (10th Cir. Nov. 30, 2023) (unpublished opinion) (quoting U.S. Env't Prot. Agency, *How Does Anaerobic Digestion Work?*, https://perma.cc/T3ZZ-XFUM).

liquid portion of the digestate and, thus, is also referred to as digestate liquor). CDPHE approved the 2010 EDOP, authorizing the facility to convert the substrates into renewable natural gas.

¶ 7 Following CDPHE's approval, BOCC issued a resolution on July 21, 2010 (2010 Resolution), approving Permit 1704, a document that also included Heartland Renewable and Shelton's Designation and identified forty-two development standards, which were site-specific conditions that the facility agreed to abide by to protect the health and welfare of the community. The 2010 Resolution stated, "Noncompliance with any of the foregoing development standards may be reason for revocation of [Permit 1704] by [BOCC]."

¶ 8 In November 2012, the consulting firm began discussions with CDPHE regarding the permit for processing compost and LSA. Fertilizer (i.e., compost or LSA, the latter being a conditioner to help improve the condition of the soil) is regulated by the Colorado Department of Agriculture (CDA). The regulated entity must submit a label to CDA if the entity seeks to distribute a fertilizer made from solid waste. Once the CDA approves the label, it issues a registration that allows the company to distribute the product.

Although Heartland intended to use the facility for compost, it never applied to CDA for a registration of its "digested solids."

¶ 9 Part of the parties' dispute revolves around whether the LSA is regulated exclusively by the CDA or whether CDPHE shares in the review process. In January 2013, the consulting firm's internal emails indicated that, to obtain CDPHE's approval of an updated EDOP, Heartland Renewable would need to obtain a "beneficial use determination" (BUD) from CDPHE before the facility distributed LSA for any land application. But in March 2013, CDPHE, Weld County, and representatives from AGEnergy USA, LLC (AGEnergy) — a consulting business associated with Heartland Renewable — had a meeting about regulating the LSA. AGEnergy representatives left the meeting believing that if Heartland Renewable obtained a registration from CDA for the LSA, no BUD from CDPHE would be required.

¶ 10 On June 6, 2013, CDA issued to Heartland Renewable Registration 9931 for its LSA, which authorized the facility to distribute its LSA as a soil amendment until June 30, 2014. Heartland Renewable submitted an updated EDOP (2013 EDOP) to

CDPHE, which indicated the facility's intended production of another output — the LSA.

¶ 11 Beginning in June 2013, EDF Renewables, Inc. — the parent company to Heartland (parent company) — began due diligence to investigate purchase of the facility from Heartland Renewable. In August 2013, Heartland acquired the facility. Heartland notified BOCC and CDPHE of the transfer of ownership; specifically, Heartland sent to CDPHE an updated EDOP in October 2013 requesting that the facility's name be updated from Heartland Renewable to Heartland. Heartland continued to use the consulting firm and hired legal counsel to assist Heartland in navigating the various laws and regulations pertaining to operating the facility.

¶ 12 From August 2013 to November 2016, Heartland never applied for a designation when it became the operator of the facility. Heartland had been told by its parent company — which based its information on advice from legal counsel — that Heartland Renewable's Designation ran with the land and, thus, the Designation transferred to Heartland when it acquired the facility. Heartland purchased the facility believing it did not need to apply to CDPHE for a BUD for its LSA, while CDPHE continued to assert

that if the LSA was to have land application, Heartland would need a BUD.

¶ 13    Beginning in September 2016, BOCC held the first of three show cause hearings to address over a hundred county residents' odor complaints about Heartland's facility. In October 2016, CDPHE contacted Weld County employees, expressing concerns with Heartland's Designation. At this point, CDPHE reached out to the Colorado Attorney General's Office, counsel for CDPHE, to investigate the status of Heartland's Designation.

¶ 14    Also in September 2016, CDPHE sent an email to Heartland indicating that Heartland could not distribute its LSA to farmers until it received a BUD from CDPHE. In December 2016, BOCC adopted CDPHE's position and informed Heartland to stop distribution of its LSA until "proper approval is granted."

¶ 15    On November 8, 2016, First Assistant Attorney General David Kreutzer (Kreutzer) sent a letter to BOCC detailing the facility's Designation history (Kreutzer letter). The Kreutzer letter asserted that Heartland did not have a designation. It acknowledged that Heartland had notified CDPHE that the facility had transferred ownership and the agency had not let Heartland know at that time

that it needed to apply for its own designation. But it also indicated that CDPHE would "encourage Heartland . . . to apply for a [designation] soon" and the agency would review any updated EDOP to ensure that the facility's "financial assurance [was] in order."

¶ 16 Following the Kreutzer letter, on November 14, 2016, BOCC held its second show cause hearing in which it heard from approximately two hundred additional county residents concerning odor complaints. BOCC also learned of the Kreutzer letter and continued the hearing until December 2016.

¶ 17 On December 19, 2016, BOCC held its third show cause hearing. Having determined that Heartland had not applied for a designation and was noncompliant with eight development standards, BOCC suspended Heartland's Permit 1704 until the entity obtained approval for a designation from CDPHE and complied with the development standards. BOCC followed its oral ruling by issuing a resolution on December 28, 2016 that indefinitely suspended Heartland's Permit 1704 until it obtained a designation.

¶ 18 In January 2017 and thereafter, Weld County and CDPHE continued to encourage Heartland to apply for a designation in its

own name but Heartland never did.  Instead, Heartland shut down the facility at the end of January 2017.  In July 2017, Heartland sued CDPHE and BOCC.[3]  In late June 2020, Heartland sold the facility to Rockland Capital for $2 million.

## II.    Standard of Review

¶ 19    We review a district court's judgment following a bench trial as a mixed question of fact and law.  *State Farm Mut. Auto. Ins. Co. v. Johnson*, 2017 CO 68, ¶ 12; *Fear v. GEICO Cas. Co.*, 2023 COA 31, ¶ 15, *aff'd on other grounds*, 2024 CO 77.  We review the district court's factual findings for clear error and will only reverse them if there is no support in the record.  *Levine v. Katz*, 192 P.3d 1008, 1012 (Colo. App. 2006).  We review the district court's legal conclusions de novo.  *Mintz v. Accident & Inj. Med. Specialists, PC*, 284 P.3d 62, 65 (Colo. App. 2010), *aff'd*, 2012 CO 50.

¶ 20    We review the district court's interpretation of constitutional provisions, statutes, and administrative regulations de novo.  *Cisneros v. Elder*, 2022 CO 13M, ¶ 21 (statutes); *Gomez v. JP Trucking, Inc.*, 2022 CO 21, ¶ 27 (administrative regulations); *Colo.*

---

[3] Initially Heartland sued CDPHE and CDA.  Later, CDA was dismissed and BOCC was added.

*Dep't of State v. Unite for Colo.*, 2024 COA 31, ¶ 26 (constitutional provisions) (*cert. granted* Nov. 25, 2024).

¶ 21     We interpret constitutional provisions and administrative regulations by employing the same rules of statutory construction as we do for statutes.  *Unite for Colo.*, ¶ 26 (constitutional provisions); *Brennan v. Broadmoor Hotel, Inc.*, 2023 COA 53, ¶ 14 (administrative regulations).  Our goal is to give effect to the General Assembly's intent.  *Parker Water & Sanitation Dist. v. Rein*, 2024 CO 71M, ¶ 42.  We read the statute as a whole, giving harmonious and sensible effects to all parts, and we presume the General Assembly intended the entire statute to be effective.  *Id.*  If the statute is plain and unambiguous on its face, we look no further.  *Town of Vail v. Vill. Inn Plaza-Phase V Condo. Ass'n*, 2021 COA 108, ¶ 11.

¶ 22     Although we are not bound by an agency's interpretation of the statute it enforces or its administrative regulations, we will defer to it if reasonable.  *Colo. Stormwater Council v. Water Quality Control Div. of the Colo. Dep't of Pub. Health & Env't*, 2023 COA 11, ¶ 38.

### III. Applicable Law

¶ 23 To provide a framework, we will set forth the applicable law for takings claims and then address CDPHE's regulation of solid waste facilities, which it concurrently shares with BOCC.

#### A. Applicable Law on Regulatory Takings Claims

¶ 24 Article II, section 15 of the Colorado Constitution provides that "[p]rivate property shall not be taken or damaged, for public or private use, without just compensation." "While a landowner is not entitled to the most beneficial use of his or her land, extensive regulatory interference warrants compensation." *Animas Valley Sand & Gravel, Inc. v. Bd. of Cnty. Comm'rs*, 38 P.3d 59, 63 (Colo. 2001) (citation omitted). A "taking can be effected by a legal interference with the physical use, possession, enjoyment, or disposition of property, or by acts which translate to an exercise of dominion and control by a governmental entity." *City of Northglenn v. Grynberg*, 846 P.2d 175, 182 (Colo. 1993).

¶ 25 A regulatory taking may be established if "the regulation imposes a 'very high' level of interference." *Forest View Co. v. Town of Monument*, 2020 CO 52, ¶ 22 (quoting *Animas Valley Sand & Gravel*, 38 P.3d at 65); *see also Rodgers v. Bd. of Cnty. Comm'rs*,

11

2013 COA 61, ¶ 18 (A regulatory taking occurs "when a government deprives a private property owner of the use of land through application of its laws or regulations."), *rev'd on other grounds*, 2015 CO 56. Under the test announced by the U.S. Supreme Court in *Palazzolo*, a landowner may prove such a claim "by showing either a per se taking or a taking under a fact-specific inquiry." *Rodgers*, ¶ 18; *see also Animas Valley Sand & Gravel*, 38 P.3d at 65 (adopting the *Palazzolo* test).

¶ 26    A per se taking is "with certain qualifications . . . a regulation which 'denies all economically beneficial or productive use of land,'" and which will require compensation under the Takings Clause. *Murr v. Wisconsin*, 582 U.S. 383, 393 (2017) (quoting *Palazzolo*, 533 U.S. at 617).

¶ 27    Absent a per se taking, a property owner may still prove a regulatory taking under a fact-specific inquiry. Under that inquiry, a taking occurs if the property "retains more than a de minimis value but, when its diminished economic value is considered in connection with other factors, the property effectively has been taken from its owner." *Rodgers*, ¶ 20 (quoting *Animas Valley Sand & Gravel*, 38 P.3d at 66). Under this analysis, courts look at

scenarios in which "a regulation impedes the use of property without depriving the owner of all economically beneficial use," by considering "'a complex [set] of factors,' including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr*, 582 U.S. at 393 (quoting *Palazzolo*, 533 U.S. at 617); *see also Town of Dillon v. Yacht Club Condos. Home Owners Ass'n*, 2014 CO 37, ¶ 44 (Whether a regulation constitutes a regulatory taking "focuses on the '*magnitude of the burden* a particular regulation imposes on private property rights.'" (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 542 (2005))).

¶ 28    Before a court even addresses whether a taking has occurred, it must first determine whether the individual or entity has a vested property interest at the time of the alleged taking.  *See Asmussen v. United States*, 2013 CO 54, ¶ 2; *see also Kobobel v. State, Dep't of Nat. Res.*, 249 P.3d 1127, 1134 (Colo. 2011) (plaintiffs had no protected property interest in the "unfettered use of the water in their wells," so the state could not have "taken" their property, and their takings claims were properly dismissed); *Classen v. City &*

13

*Cnty. of Denver*, 30 P.3d 710, 713 (Colo. App. 2000) (holding that plaintiff property owners had no protected property interest in the navigable airspace, so there was no compensable physical taking).

¶ 29    A vested property interest may be created by the Colorado or Federal Constitutions, but such interests may also "be created and their dimensions defined by other sources such as contracts or state statutes or rules." *Anderson v. Colo. State Dep't of Pers.*, 756 P.2d 969, 976 (Colo. 1988); *see also Dove Valley Bus. Park Assocs., Ltd. v. Bd. of Cnty. Comm'rs*, 945 P.2d 395, 401 (Colo. 1997) ("Property interests 'are defined by existing rules or understandings that stem from an independent source such as state law.'" (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980))); *JJR 1, LLC v. Mt. Crested Butte*, 160 P.3d 365, 369 (Colo. App. 2007) (a protected property interest is not limited to tangible physical property, but also includes a legitimate claim of entitlement to other circumscribed benefits, which may be derived from state or municipal legislative enactment).

## B. Applicable Law Regarding CDPHE and BOCC's Authority over Solid Waste Facilities

¶ 30    CDPHE is authorized under the Solid Wastes Disposal Sites and Facilities Act (the Act) to regulate and oversee solid waste facilities and sites. *See* §§ 30-20-100.5 to -124, C.R.S. 2024. Any person or entity owning or operating a solid waste facility "shall first obtain a certificate of designation from the governing body having jurisdiction over the area in which such site and facility is located." § 30-20-102(1), C.R.S. 2024. A "[g]overning body having jurisdiction" is defined as "the board of county commissioners if a site and facility is located in any unincorporated portion of a county and means the governing body of the appropriate municipality if a site and facility is located within an incorporated area." § 30-20-101(2.5), C.R.S. 2024.

¶ 31    The person or entity applying for a designation must first submit an application with the BOCC, and then the application shall be "referred to [CDPHE] for review and for recommendation as to approval or disapproval." § 30-20-103(1), C.R.S. 2024. CDPHE's technical review of the application is based on criteria "by the solid and hazardous waste commission, the water quality control

15

commission, and the air quality control commission." *Id.* CDPHE's approval of the application is necessary before BOCC may issue the designation. § 30-20-105(1), C.R.S. 2024. Once issued, the "certificate shall be displayed in a prominent place at the site and facility." *Id.*

¶ 32 In addition to the designation, a solid waste facility must also obtain a permit from the BOCC. Besides a permit being necessary under the Act, Weld County deemed the solid waste facility to be in an agricultural zone and required a permit "to ensure that [the facility was] established and operated in a manner that is compatible with existing and planned land USES in the NEIGHBORHOOD" and "to protect and promote the health, safety, convenience and general welfare of the present and future residents of the COUNTY." Weld County Zoning Ordinance § 23-2-200(A). Applicants must comply with the factors identified in the Act, *see* § 30-20-104, C.R.S. 2024, and Weld County Zoning Ordinance sections 23-1-10, 23-2-200, and 23-2-290.

IV. Jury Trial

¶ 33 Heartland contends that it was entitled to a jury trial for its regulatory taking claims against CDPHE and BOCC because (1)

16

regulatory takings are different than other takings claims and, thus, should be decided by a jury; and (2) C.R.C.P. 38 entitles it to a jury trial as its claims are more legal than equitable. Resolution of the first issue is dispositive, so we need not address the second.

¶ 34    Heartland requested a jury trial in its initial complaint, which included two claims for promissory estoppel. As a result, the parties assumed the case would be tried to a jury. But by the operative third amended complaint, Heartland's remaining claims were limited to regulatory takings claims against CDPHE and BOCC.

¶ 35    After the district court denied motions for summary judgment, BOCC and CDPHE requested that the district court decide the initial question of whether a taking had occurred. If the court determined liability against defendants, they then agreed that damages would be decided by a jury. The court agreed and concluded that the "law is clear that the determination of whether a taking occurred is a question of law to be decided by the court."

Article II, section 15 of the Colorado Constitution provides that

> [s]uch compensation shall be ascertained by a board of commissioners . . . or by a jury, when required by the owner of the property . . . ; and

17

> whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question.

CDPHE and BOCC rely on the constitution's plain language to support their assertion that whether a taking occurred is determined by the courts. But the constitution's language does not state this proposition as plainly as they claim. For two other reasons, we agree that whether a regulatory taking has occurred is a question reserved for the court's determination.

¶ 36 First, Colorado courts treat the initial question of whether a taking has occurred as one decided by the court. *Kobobel*, 249 P.3d at 1133 (citing *Animas Valley Sand & Gravel*, 38 P.3d at 63). Heartland tries to distinguish this case law as limited to eminent domain proceedings, which they argue are different from non-eminent domain regulatory takings. But a closer reading of the case law suggests otherwise. To place the case law in context, however, we first address the three types of takings claims: (1) eminent domain proceedings; (2) inverse condemnation actions; and (3) regulatory taking claims. *See State, Dep't of Health v. Mill*, 809 P.2d 434, 437-38, 440-441 (Colo. 1991) (*Mill I*).

18

¶ 37 Colorado eminent domain proceedings are governed by statute. *See* §§ 38-1-101 to -107, C.R.S. 2024. Thus, "the General Assembly must confer [the power of eminent domain] expressly or by clear implication; 'it can never be implied from doubtful language.'" *Sos v. Roaring Fork Transp. Auth.*, 2017 COA 142, ¶ 16 (citations omitted). The eminent domain statute provides that "[a]ll questions and issues, except the amount of compensation, shall be determined by the court unless all parties interested in the action stipulate and agree that the compensation may be so ascertained by the court." § 38-1-101(2)(a).

¶ 38 Inverse condemnation proceedings involve a property owner bringing a claim "when state action has the effect of substantially depriving the property owner of the use and enjoyment of the property, but the State has not formally brought condemnation proceedings." *Kobobel*, 249 P.3d at 1133. Eminent domain and inverse condemnation proceedings are conducted in the same manner. *See Grynberg*, 846 P.2d at 178 ("Because an inverse condemnation action is based on the 'takings' clause of our constitution, it is to be tried as if it were an eminent domain proceeding."). A plaintiff may only bring an inverse condemnation

proceeding against a state entity who has the power of eminent domain at the time of the taking. *Mill I*, 809 P.2d at 437.

¶ 39　Regulatory takings are distinct from eminent domain and inverse condemnation proceedings because they allow a plaintiff to sue even when the state entity does not possess the power of eminent domain. *Id.* at 440. A regulatory taking claim exists because "[l]imiting a property owner to an inverse condemnation action against an agency that does not have the power of eminent domain would enable the State to take property without paying compensation, in violation of the United States and Colorado Constitutions." *Id.*

¶ 40　A "central dynamic" of regulatory takings jurisprudence is its "flexibility" by allowing "ad hoc, factual inquiries, designed to allow careful examination and weighing of all the relevant circumstances." *Murr*, 582 U.S. at 393-94 (quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002)). Although "[r]egulatory takings are difficult to define," *Mill I*, 809 P.2d at 440, "[t]he determination of whether a regulation goes 'too far' . . . is essentially an 'ad hoc, factual' inquiry." *Animas Valley Sand & Gravel*, 38 P.3d at 65 (citation omitted)

¶ 41     In *State, Department of Health v. Mill*, 887 P.2d 993 (Colo.

1994) (*Mill II*), the supreme court instructed courts on the factors to

consider to determine whether a taking had occurred.  In that case,

the court reviewed both regulatory takings and eminent domain

claims brought by the operator of a uranium milling operation

against the Colorado Department of Health.  The supreme court

explained that courts should look at several factors that later

became associated with *Palazzolo*, including "the character of the

governmental action, its economic impact, and its interference with

reasonable investment-backed expectations."  *Mill II*, 887 P.2d at

999 (quoting *Golden Pac. Bancorp v. United States*, 15 F.3d 1066,

1072 (Fed. Cir. 1994)).  These factors all relate to determining

whether the diminution in a landowner's property is a regulatory

taking.

¶ 42     In *Animas Valley Sand & Gravel*, 38 P.3d at 65, the supreme

court analyzed the two-tiered *Palazzolo* inquiry.  The court said that

"[i]f a landowner fails to meet its burden of proving a *per se* taking,

it can still prove a taking under a fact-specific inquiry."  *Id.*  When

discussing the regulations at issue and their effect on the

economically beneficial uses of the property at issue, the court

articulated the necessary fact-specific inquiry that should be undertaken, stating, "*[t]he trial court* must determine to what degree the current restrictions on [landowner's] property are attributable to the plan rather than to the accumulated state and federal regulations of the past several decades," and "*the trial court* must then quantify the resulting diminution in value, if any, of the property." *Id.* at 66 (emphasis added).

¶ 43 As part of the second portion of the inquiry, *Animas Valley Sand & Gravel* recognized the ad hoc inquiry that must be undertaken by the district court, noting, "[e]ach case must be decided on its own facts." *Id.* at 67. It further indicated that "if [the landowner] is to prevail, it must show that it falls into the rare category of a landowner whose land has a value slightly greater than de minimis but, nonetheless, given the totality of the circumstances, has had its land taken by a government regulation." *Id.*

¶ 44 And there are numerous Colorado regulatory takings cases in which the court determined the takings question. For example, *Kobobel* holds expressly that the taking question is one for the court. 249 P.3d at 1133 (the plaintiff-well owners alleged that "the

22

State's cease and desist orders amounted to a regulatory taking of their properties because" it deprived them "of their vested rights to use the water in their wells and thereby precluded any economically beneficial use of their land"); *see also Krupp v. Breckenridge Sanitation Dist.*, 19 P.3d 687, 695 (Colo. 2001) (plaintiff-landowner brought an action under C.R.C.P. 106(a)(4) alleging that the special district's assessment was an unconstitutional taking of their property and the court applied the codified regulatory taking provision for discretionary and adjudicatory land use decisions under section 29-20-203(1), C.R.S. 2000); *Rodgers*, ¶¶ 18, 22 (affirming a district court's order that "no regulatory taking had occurred because the County's regulations served a legitimate purpose, the regulations were reasonably applied to plaintiffs, and that application did not deny them an economically viable use of their property").

¶ 45    Heartland has not cited, nor are we aware of, any Colorado case holding that a regulatory taking must be decided by a jury instead of the court.

¶ 46    Second, Heartland's contention that eminent domain proceedings are not generally fact-intensive inquiries so as to be

23

decided by the court is undermined by *Carousel Farms Metropolitan District v. Woodcrest Homes, Inc.*, 2019 CO 51, ¶¶ 17-18.  That case dealt with eminent domain proceedings brought by a district against a developer.  *Id.* at ¶¶ 8-9.  The supreme court concluded that takings claims are reviewed as "mixed questions of law and fact" with a district court's findings of fact reviewed for clear error and its legal conclusions reviewed de novo.  *Id.* at ¶¶ 17-18.  Given that there may be disputed issues of fact in an eminent domain proceeding as well, it makes no sense for a regulatory takings claim to be treated differently; indeed, the court is able to resolve any factual disputes for a regulatory taking as it does in an eminent domain proceeding.

¶ 47    And Heartland's reliance on *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 721 (1999), to support that a regulatory takings claim is subject to a jury trial is misplaced.  *Del Monte Dunes* said that "the issue whether a landowner has been deprived of all economically viable use of his property is a predominantly factual question," and "in actions at law *otherwise within the purview of the Seventh Amendment,* this question is for the jury."  *Id.* at 720-21 (emphasis added).  But the Seventh

Amendment does not apply to cases in state court. *See id.* at 719. And in Colorado, there is no constitutional right to a jury trial in a civil action. *Mason v. Farm Credit of S. Colo.*, 2018 CO 46, ¶ 9. Thus, the supreme court's federal constitutional holding in *Del Monte Dunes* has no bearing on whether the existence of a regulatory taking is for the court or the jury under state law.

¶ 48    We also disagree that CDPHE and BOCC acted inconsistently by litigating the case as if liability and damages would be tried before a jury. When CDPHE asked for a bench trial on the takings issue near the eve of trial, the court asked the government why it had not raised this issue earlier. CDPHE said it assumed Heartland would ask the court for an evidentiary hearing on the liability issue because the initial inquiry is a question of law. To support its position, CDPHE provided jury instructions related only to damages for just compensation and not for liability. We acknowledge that CDPHE and BOCC should have stated their positions on this matter sooner with the court. But given the constitutional provision and the resulting case law, the court's ruling was correct.

¶ 49    Thus, we conclude the district court did not err by deciding whether CDPHE's and BOCC's actions constituted a taking.

## V. Heartland's Takings Claims

¶ 50 Heartland contends that CDPHE's and BOCC's actions forced it to shut down its facility and amounted to regulatory taking of its (1) Designation and Permit 1704; (2) Registration 9931; and (3) property improvements. These takings claims presuppose that Heartland had a protected property interest. But we agree with the district court that Heartland did not have a protected property interest because it lacked its own designation.[4]

### A. Heartland's Designation

¶ 51 Heartland contends that it had a protected property interest in a designation because (1) when Heartland purchased the facility,

---

[4] A license or permit is generally not considered "property" for purposes of the Takings Clause, as it is considered a privilege that the government may, at its discretion, take away. *See, e.g.*, *Fed. Lands Legal Consortium v. United States*, 195 F.3d 1190, 1197 (10th Cir. 1999). But we review the district court's property interest analysis on the merits because whether the government improperly denied the *existence* of a valid license or permit that was issued to an entity is distinct from whether the government lawfully suspended or revoked the license. But given our disposition that Heartland lacked a protected property interest, we need not review the district court's determinations that CDPHE's and BOCC's actions did not constitute takings per se or takings under the fact-specific inquiry. *See Fasing v. LaFond*, 944 P.2d 608, 612 (Colo. App. 1997) (an appellate court may affirm a district court's judgment on a "narrower basis").

26

Heartland Renewable's Designation ran with the land; (2) Heartland Renewable's Designation was transferred to Heartland pursuant to a now-repealed CDPHE regulation, Rule 1.8.4(D), 6 Code Colo. Regs. 1007-2 (effective until July 14, 2018) (Rule 1.8.4); or (3) defendants were equitably estopped from denying Heartland had a designation. We reject all three arguments.

### 1. The Designation Did Not Run with the Land

¶ 52    In evaluating whether Heartland Renewable's Designation ran with the land, the district court reasoned that the Act and case law supported that a designation is non-transferable; Heartland's employees knew the process for a designation had two parts; Heartland was provided with the opportunity to apply for a designation but never did; and Heartland was granted, at most, a privilege if it had its own designation. We conclude the district court's analysis is correct for four reasons.

¶ 53    First, as the district court decided, *City & County of Denver v. Eggert*, 647 P.2d 216, 221-22 (Colo. 1982), is controlling that such a designation is non-transferable from property owner to property owner without prior approval. In that case, the city and its private contractor did not apply for a new designation on grounds they

27

believed the facility at issue was covered by the city's existing designation. *Id.* at 221. The court held that the facility could operate under the city's designation "if pursuant to contract with Denver and in compliance with the Solid Wastes Act." *Id.* at 226.

¶ 54 But for the contractual relationship between the city and the new operator, the court held that section 30-20-104(1)(c) "implies that a new certificate is required when there is a change of operator, because the [county] Commissioners could not consider the ability of the operator to manage the site absent an application for a new certificate." *Id.* at 226. This is because the county commissioners and CDPHE must consider whether the applicant can "comply with the health standards and operating procedures" of the state and local government. *Id.* (quoting § 30-20-104(1)(c)). *Eggert* further reasoned that the "Solid Wastes Act is in the nature of a licensing statute which requires the operator of a waste disposal facility to obtain a certificate" and that, "normally, a certificate to operate a particular site and facility is personal and nontransferable without prior approval." *Id.*

¶ 55 Heartland did not contract with Heartland Renewable to share operations; instead Heartland became the new owner and operator,

so *Eggert*'s rule is directly on point. In addition, the language of section 30-20-104(1)(c) has not changed since *Eggert*. We are bound by supreme court precedent, *see In re Estate of Ramstetter*, 2016 COA 81, ¶ 40, and see no reason why the supreme court would depart from its interpretation of the Act.

¶ 56 And Heartland's reliance on *Board of County Commissioners v. Colorado Department of Public Health & Environment*, 218 P.3d 336, 338 (Colo. 2009), and *Town of Lyons v. Bashor*, 867 P.2d 159, 160-61 (Colo. App. 1993), does not advance its position.

¶ 57 In *County Commissioners*, 218 P.3d at 338, the supreme court determined that a county had standing to sue CDPHE when the regulated entity had not first applied for a designation under the Act, yet CDPHE had already issued to the regulated entity a license and permit under the Low-Level Radioactive Waste Act and the Hazardous Waste Siting Act. The case cites section 30-20-102(1) of the Act by noting that "[a] [designation] is a land use and zoning device by which a county selects sites for waste disposal." *Id.* at n.1. But this footnote says nothing about the designation "running with the land." And even assuming the footnote could be read in that way, the supreme court could not decide whether the

designation ran with the land because the central dispute in the case was that the regulated entity *had not* applied for a designation. Therefore, the footnote is at most dicta and the case is inapposite.

¶ 58    *Lyons*, 867 P.2d at 160, is likewise not applicable.  There, the supreme court held that the town could bring an action to enjoin a current or future zoning violation.  But the court held that the town could not enjoin the sale of the parcel at issue because, although the lot contained two residences, the property was a prior nonconforming use before the town adopted its zoning ordinances. The supreme court held that "the property's exemption from the Town's zoning regulations as a prior nonconforming use runs with the land."  *Id.*  No one has argued that Heartland's facility constituted a "nonconforming use," or that Permit 1704 constituted a nonconforming use exempt from BOCC's regulation.

¶ 59    Second, while there was testimony supporting that BOCC told Heartland it had a designation, the record supports that Heartland failed to take steps that could have clarified issues.  As relied on by Heartland, it is true that Permit 1704 included the forty-three development standards, of which Heartland says that standard thirty references a facility's requirement to comply with the

designation.  And there was testimony that Weld County believed that the Designation transferred with the land.  The district court, however, concluded with record support that "[Permit 1704] and the [Designation] are two separate permits with two distinct purposes." *See also Lambland, Inc. v. Heartland Biogas, LLC*, No. 22-1184, 2023 WL 8276140, at *5 n.5 (10th Cir. Nov. 30, 2023) (unpublished opinion) (determining "[Permit 1704] and [the Designation] are two separate permits with two distinct purposes").

¶ 60    And the court noted that Heartland was aware a designation and permit were two separate requirements.  The court concluded that despite BOCC's confusion (and to some extent CDPHE's) as to whether Heartland had its own designation, "the duty and responsibility was on Heartland to ensure it had all applicable permits to own and operate a solid waste site and facility."

¶ 61    The record supports the court's legal conclusions.  The fact that Heartland hired attorney Mave Gasaway (Gasaway) to determine Heartland's regulatory requirements demonstrates that it understood that it had the obligation to comply with the law. Gasaway confirmed that she did not conduct legal research before advising Heartland that the Designation ran with the land,

specifically admitting that she had read neither the Act nor *Eggert*. If she had conducted legal research, any misunderstanding or miscommunication would likely have been clarified. For example, Gasaway did not ask CDPHE about Heartland Renewable's Designation or other legal requirements under the Act.

¶ 62 Additionally, Tom Haren (Haren) — owner of the consulting firm — acknowledged that BOCC cannot issue a designation unless CDPHE approves the EDOP. He said, "[T]he County would approve [the permit], but the County cannot approve a [designation] or a solid waste site without CDPHE approving it first." Haren also acknowledged that he heard Gasaway's testimony and she agreed that the Designation and Permit 1704 are "separate permits." And he testified that he did not ask any Weld County employees whether Heartland Renewable's Designation transferred to Heartland.

¶ 63 Third, Haren's testimony confirms that BOCC cannot control the designation process. The Act is unequivocal that BOCC may not issue a designation without approval from CDPHE. Indeed, section 30-20-105(1) directs that BOCC "shall not issue a certificate of designation if the department has recommended disapproval pursuant to section 30-20-103." We read the word "shall" as

32

mandatory, so BOCC's issuance of Permit 1704 is not controlling. *See Colo. Real Est. Comm'n v. Vizzi*, 2019 COA 33, ¶ 27 (absent a clear indication from the General Assembly, courts interpret the word "shall" to be mandatory, not discretionary).

¶ 64 Finally, Heartland argued that while it did not need to apply for a new designation because Heartland Renewable's Designation ran with the land, any new application was futile because it might not have been approved by the regulators. The court rejected this contention, stating, "Heartland's argument that their application would not have been authorized falls flat because it was the same regulators requesting the new application."

¶ 65 The record supports that CDPHE and BOCC encouraged Heartland to apply for a designation and that neither government entity was actively trying to shut down Heartland. Indeed, the fact that CDPHE and BOCC were asking Heartland to apply for its own designation supports that its predecessor's Designation did not run with the land. Heartland employees acknowledge that those entities encouraged them to submit an application. Specifically, the Kreutzer letter said, "[CDPHE] will encourage Heartland Biogas LLC to apply for a [designation] soon." And Ralph Daley — vice-

president of Heartland's parent company and the lead development officer for the facility — was asked, "Isn't it true that David Kreutzer encouraged Heartland to apply for its own [Designation]?" He responded, "The letter did suggest that."

¶ 66    Instead, Heartland took the position that it did not need to apply for a designation because it already had one. When asked why Heartland did not apply for one, Alfred Kurzenhauser — head of the Heartland facility and of other bioenergy projects for the parent company — responded, "Well, we — first of all, we didn't believe our [Designation] was invalid. We thought it was valid, and we were advised it was valid." Jason Thomas — the facility's plant manager — also testified that the company did not apply for a designation because, "Heartland, in its original purchase of the facility, didn't need to because it had a [Designation]."

¶ 67    Even if Heartland disagreed with the government entities' positions, the record does not support that applying for a designation would have been futile. The court said, "Testimony was provided that another solid waste facility was also directed to apply for a new [designation] by Weld County employees which it

promptly did." That other facility received its designation about four months after application.

¶ 68 More significantly, though, testimony from Joe Schieffelin — program manager for CDPHE's solid waste and materials division — confirmed that the agency viewed Heartland's lack of a designation as a "technical administrative violation," it did not intend to treat Heartland with a "heavy hand," it intended to "expedite" the EDOP approval process so that BOCC could issue a new designation, and it had no intention to force Heartland to "stop" its operations.

2. CDPHE's Rule 1.8.4(D) Did Not Permit the Transfer

¶ 69 Heartland contends that Rule 1.8.4(D) authorized the Designation to transfer to a new owner because Heartland provided financial assurances to CDPHE and BOCC.

¶ 70 When in effect, Rule 1.8.4(D) provided, "A certificate of designation may not be transferred to a new owner or operator unless, as part of the process, the assignment or transfer of the financial instrument(s) or alternate financial assurance has been reviewed and approved by the Department and the governing body having jurisdiction."

¶ 71 CDPHE testified that the rule is now repealed because it was determined to be inconsistent with section 30-20-104(1)(c) and *Eggert.* *See Colo. Consumer Health Initiative v. Colo. Bd. of Health*, 240 P.3d 525, 528 (Colo. App. 2010) (An administrative regulation "may not modify or contravene an existing statute, and any rule that is inconsistent with or contrary to a statute is void.").

¶ 72 Regardless, Heartland raised this argument in related litigation and it was rejected. A purchaser of Heartland's product sued Heartland in federal district court on grounds that Heartland failed to have a designation. In upholding the district court's determination that Heartland Renewable's Designation did not transfer to Heartland, the Tenth Circuit said, "Rule 1.8.4(D) does not purport to outline the universe of requirements for transferring a [designation]." *Lambland, Inc.*, 2023 WL 8276140, at *4. The court reasoned, "Rather, read in context, Rule 1.8.4(D) is part of a subsection of rules on 'Financial Assurance Criteria' and, by its terms, Rule 1.8.4(D) speaks only to 'part of the process' of transfer to a new owner or operator." *Id.* Regardless of any preclusive effect of the Tenth Circuit's holding, we find it persuasive and a reasonable interpretation of the limited nature of the now-repealed

provision of Rule 1.8.4(D). In other words, to the extent Heartland complied with Rule 1.8.4(D), that compliance did not in itself transfer Heartland Renewable's Designation to Heartland.

### 3. Equitable Estoppel

¶ 73 Finally, Heartland contends defendants were equitably estopped from denying Heartland has a designation.

¶ 74 Equitable estoppel is a factual question that we review for clear error. *In re Marriage of Kann*, 2017 COA 94, ¶ 62.

¶ 75 There are three elements of an equitable estoppel claim as it relates to the party estopped:

- "[c]onduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert," *City of Thornton v. Bijou Irrigation Co.*, 926 P.2d 1, 76 (Colo. 1996) (quoting *Aubert v. Town of Fruita*, 559 P.2d 232, 234 (Colo. 1977));

- "intention, or at least expectation, that such conduct shall be acted upon by the other party, *id.* (quoting *Aubert*, 559 P.2d at 234); and

- "knowledge, actual or constructive, of the real facts," *id.* (quoting *Aubert*, 559 P.2d at 234).

¶ 76     As the party claiming estoppel, the individual or entity must prove (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially.  *Id.*  "[F]ailure to establish any one of the elements of estoppel bars such a claim." *Id.*

¶ 77     On the merits, Heartland's equitable estoppel claim fails because it did not demonstrate that CDPHE or BOCC misrepresented facts to it, much less that the government entities knew those facts to be false at the time any statements were made. Moreover, "[a]s a general rule, those who deal with the Government are expected to know the law and may not rely on the conduct of government agents contrary to the law." *Dep't of Transp. v. First Place, LLC*, 148 P.3d 261, 267 (Colo. App. 2006) (quoting *Emery*

*Mining Corp. v. Sec'y of Lab.*, 744 F.2d 1411, 1416 (10th Cir. 1984)). The district court determined that Heartland was responsible for knowing the laws and regulations related to owning and operating a solid waste facility. And Heartland could have clarified any misunderstanding with further steps taken by its legal counsel or consulting firm.

¶ 78 But Heartland's equitable estoppel claim fails on a more fundamental basis as well. Heartland is estopped from raising such a claim based on the position it took in a previous appeal in this case. In that appeal, Heartland asserted that its regulatory takings claims were not a tort, nor could such claims lie in tort and, therefore, the court had improperly dismissed them because they were not barred by the Colorado Governmental Immunity Act (CGIA). *See Heartland Biogas, LLC v. Colo. Dep't of Pub. Health & Env't*, (Colo. App. No. 19CA0860, Sept. 3, 2020) (not published pursuant to C.A.R. 35(e)).

¶ 79 The CGIA provides that a "public entity is immune from liability in all claims for injury that lie in tort or could lie in tort." § 24-10-106(1), C.R.S. 2024. But "[e]quitable estoppel, because it is based on the misrepresentation of facts, is fundamentally a tort

39

theory. The CGIA is applicable to such claims." *Berg v. State Bd. of Agric.*, 919 P.2d 254, 259 (Colo. 1996) (citations omitted). Heartland cannot now rely on the doctrine of equitable estoppel, as it would be inconsistent with the position it previously took.

¶ 80    Although the court did not address the CGIA as a basis to deny Heartland's equitable estoppel claim, "we may affirm the trial court's ruling based on any grounds that are supported by the record." *Rush Creek Sols., Inc. v. Ute Mountain Ute Tribe*, 107 P.3d 402, 406 (Colo. App. 2004).

### B.    Registration 9931

¶ 81    The court concluded that Heartland needed a BUD from CDPHE before it could distribute its compost or LSA for land application. Heartland contends that this conclusion was error because the court (1) made inconsistent findings by saying that CDA had exclusive jurisdiction over fertilizer on one hand, and determining that Heartland needed to obtain a BUD from CDPHE on the other; and (2) failed to determine whether CDPHE's actions constituted a taking of its Registration 9931.

¶ 82    It is true that the district court made findings that CDA had "exclusive regulatory authority over the liquid digestate," but it also

40

concluded that, by a preponderance of the evidence, "CDPHE and CDA are the technical experts in determining whether a compost (solids) or effluent (liquids) can be suitable for off-site land application/distribution." This, however, is not reversible error given the court was weighing the evidence and resolving conflicting evidence.

¶ 83 The court said that based on the testimony of Haren and David Snapp (Snapp) — CDPHE's lead person at the relevant time to handle BUDs — a BUD was required prior to land application of the LSA as well as the solid compost. The court did not specifically make findings that these witnesses were credible, but we conclude that a credibility determination is implicit in the court's ruling. Indeed, there was conflicting evidence about the March 2013 meeting as to whether CDPHE ceded all authority to CDA for regulation of Heartland Renewable's compost and LSA or whether CDPHE deferred making a determination as to how those products might be regulated once the facility was operational. In this regard, because there was conflicting evidence, the trier of fact had to weigh the evidence and make credibility determinations to come to its findings. *See People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15.

Even if this meeting occurred before Heartland acquired ownership, the record supports that CDPHE told Heartland that it needed a BUD for its LSA.

¶ 84    Snapp explained his takeaway from the March 2013 meeting and his following interactions with Heartland through 2013:

- He attended the March 2013 meeting even though he was not listed on the agenda, as a coworker came by asking him to join at the last minute because BUDs were to be discussed.

- The portion of the facility dealing with the liquid digestate was not yet operational so CDPHE would not have made a determination to relinquish regulatory oversight solely to CDA until it had more information about the product.

- The 2013 EDOP included a placeholder for Heartland and AGEnergy to later seek a BUD for the LSA and compost so that CDPHE would approve it.

- CDPHE was concerned with the over-application of the LSA because of its liquid form and because it might contaminate groundwater, which were different concerns not generally present with other composting products.

- Even if other sections of CDPHE were responsible for review of certain regulatory acts by the facility's operations (e.g., the Water Quality and Control Division), Snapp handled all CDPHE BUD determinations.

- Snapp distinctly remembered telling Heartland Renewable that "they would need to either get a discharge permit or a [BUD]."

- From January 2013 to September 2016, Snapp testified that CDPHE told Heartland or its consultants eight or nine times that it had to obtain a BUD before land application of its effluent.

- Snapp explained the "dual track" regulation of LSA between CDPHE and CDA, saying, "[CDPHE] regulate[s] everything that goes in and out of a solid waste facility, and CDA regulates products."

- After receiving additional information and test samples from Heartland, CDPHE conditionally approved a BUD for Heartland's LSA in January 2017.

Because there is record support that CDA and CDPHE regulate different aspects of LSA and CDPHE repeatedly told Heartland it would need a BUD regardless of Registration 9931, the district

43

court's findings are not clearly erroneous.  *Levine*, 192 P.3d at 1012.

¶ 85    And based on the court's determination that only CDA has authority to revoke or suspend Registration 9931, and a CDA representative testified that no regulatory action was taken against Heartland's Registration 9931, CDPHE or BOCC could not have "taken" that property interest.  It is true that BOCC ordered Heartland to stop distributing its LSA until it complied with CDPHE's BUD process.  But the record supports that once CDPHE received the requested information from Heartland, Snapp provided conditional approval within a day.  Therefore, implicit in the court's findings, CDPHE's or BOCC's actions did not constitute a regulatory taking of Registration 9931 because (1) Heartland was not in compliance with CDPHE regulations; (2) BOCC simply followed CDPHE's regulations; (3) Heartland admitted to putting chlorine in the ponds that stored the digestate liquid (one of CDPHE's concerns); and (4) CDPHE ultimately provided BUD approval once Heartland provided the "lab data from a representative sample of the LSA to show suitability for intended beneficial uses and an ongoing sampling plan to be land applied."  *See In re Marriage of*

*Nelson*, 2012 COA 205, ¶ 41 (although the district court made no express findings that retroactive application of its ruling would not create financial hardship for husband, district court's other findings support the "apparent conclusion"); *Foster v. Phillips*, 6 P.3d 791, 796 (Colo. App. 1999) (although it is a better practice for a district court to make express findings, they may be implicit in the court's ruling).

### C. Heartland's Land and Property Improvements

¶ 86    Heartland contends that the court completely ignored its undisputed protected property interest in its land and property improvements. Although not specifically addressed by the court, we conclude the court's judgment implicitly rejected this claim. *Rush Creek Sols.*, 107 P.3d at 406.

¶ 87    The district court's order said that *Animas Sand & Gravel* directed that the "appropriate focus of a takings inquiry" involves "the property rights as an aggregate," meaning that "where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety." *Animas Valley Sand & Gravel*, 38 P.3d at 68 (quoting *Andrus v. Allard*, 444 U.S. 51, 65-66 (1979)).

¶ 88    Because Heartland is not entitled to the "most beneficial use of" its land, *see id.* at 63, we cannot say the court committed reversible error.  Heartland does not allege that it could not, before it sold the facility, use the land for another commercially viable purpose; it had, as discussed above, the opportunity to apply for its own designation; and it could have used the facility to manufacture compost (digested solids) while it worked to comply with the applicable regulations for its LSA.

## VI.    BOCC Police Powers

¶ 89    Heartland contends that the district court's findings that BOCC properly exercised its police powers lacks evidentiary support.  It contends that (1) BOCC and CDPHE did not give it sufficient time to apply for a designation; (2) because Heartland was not in violation of local odor ordinances, the record lacks evidentiary support for the valid exercise of BOCC's police power; (3) even if BOCC's use of its police power was reasonable, its actions could still constitute a regulatory taking; and (4) the district court erred by allowing additional witnesses to testify for CDPHE and BOCC when Heartland did not have time to conduct discovery.

¶ 90 Because Heartland lacked a protected property interest in a designation, there was no regulatory taking regardless of whether BOCC validly exercised its police power. And because Heartland did not raise a separate due process challenge against CDPHE or BOCC, we need not review Heartland's additional contentions. *See Fasing v. LaFond*, 944 P.2d 608, 612 (Colo. App. 1997).

## VII. Conclusion

¶ 91 We affirm the district court's judgment.

JUDGE FOX and JUDGE SCHOCK concur.